# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

### BROWNE v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 7, 1905.)

No. 42.

1. GRAND JURY—INDICTMENT—SUFFICIENCY—UNITED STATES ATTORNEY—REGULARITY OF APPOINTMENT.

It is no objection to an indictment that the assistant United States attorney, who appeared before the grand jury finding the indictment, took his oath of office the day before such appearance, and, indictment being found, resigned after holding office only six days; and it is immaterial whether the salary of such assistant was illegal, and whether he was also counsel for persons having claims against the government.

2. CUSTOMS DUTIES—CUSTOMS EXAMINER—INDICTMENT.

An indictment charging a customs examiner with knowingly passing invoices containing false statements as to the weight of imported merchandise will not be held insufficient on the theory that the law provides that weighing is to be done by officers known as weighers, and that therefore the examiner could not legally pass the invoices.

3. CONSPIRACY—INDICTMENT—CHARGING PART—VIDELICET.

The first part of a count in an indictment set forth that certain persons "unlawfully did conspire" to defraud the United States, the conspiracy "to be effected in the manner following; that is to say"—and the following part stated the details of the alleged conspiracy. Held, that the latter part is not to be construed as a videlicet separate from the charge of the indictment, but that the whole sentence may be considered as the charging part.

4. CUSTOMS DUTIES—INDICTMENT—ALLEGATION ' OF FRAUDULENT INTENT—EQUIVALENT EXPRESSION.

The allegation, in an indictment for conspiracy to defraud the customs revenue, that certain acts were done "to the end that" less than the legal amount of duties should be collected by the collector of customs, held sufficient as an allegation of corrupt and fraudulent intent.

5. CONSPIRACY—INDICTMENT—REFERENCE IN ONE COUNT TO MATTER IN ANOTHER.

The first count of an indictment alleged conspiracy, and each of the other counts presented a different overt act, but did not repeat the presentment as to the conspiracy in furtherance of which the act was committed, but did state that such act was "in further pursuance of the said unlawful conspiracy in the first count in this indictment mentioned

145 F.—1

and described," etc. *Held*, that repetition may properly be avoided by so referring from one count to another, and that this was a sufficient reference to the first count to incorporate the matter therein with that in the count containing the reference, without expressly stating that such matter is made a part of the latter count.

6. JURY—EXAMINATION OF TALESMEN.

*Held* without merit, the objection that on a criminal prosecution the defendant should have had opportunity, before being compelled to make his peremptory challenges, to examine on voir dire not only the jurors whose names have been drawn from the wheel and who have gone into the box, but also the entire panel from which vacancies caused by challenges may be filled.

7. CONSPIRACY—EVIDENCE—PROOF OF EX POST FACTO ACTS.

An indictment charged the defendants with having conspired together "before and on" a certain date. *Held* that, while evidence of acts done after that date was inadmissible as direct proof of an act then done in furtherance of the conspiracy, it was competent as proof of acts done before or on said date.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Conspiracy, § 100.]

8. CRIMINAL LAW—TRIAL—CHARGE TO JURY—REQUESTS TO CHARGE.

In charging the jury, the judge is under no obligation to adopt the verbiage of any particular court. If he has already set forth a rule of law correctly, he may properly refuse to repeat it in a different form of words which may have been used in the opinion of some court.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 2011–2014.]

9. SAME—REASONABLE DOUBT—REPUTATION OF DEFENDANT.

Regarding the rule that a jury must be convinced beyond a reasonable doubt of the guilt of the defendant, *held* not reversible error to refuse to charge, in a case depending upon circumstantial evidence, that evidence of good character is of itself sufficient to create a reasonable doubt to which the defendant is entitled.

10. SAME—NEW TRIAL—CO-CONSPIRATORS.

*Held* that, where two persons on trial for conspiracy had been found guilty, it was no error to refuse a new trial to one of the defendants and grant it to the other.

In Error to the District Court of the United States for the Southern District of New York.

For proceedings below, see 126 Fed. 766 and 128 Fed. 615.

This cause comes here upon writ of error to review a conviction of the plaintiff in error under section 5440, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3676], which reads as follows: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than $1,000 and not more than $10,000, and to imprisonment not more than two years."

Three persons were included in the indictment, A. S. Rosenthal and Martin L. Cohn, composing the firm of A. S. Rosenthal & Co., importers of silk goods, and plaintiff in error, an examiner in the appraisers' division of the New York custom house. The contention of the government was that the members of the firm were to enter goods knowingly and fraudulently upon false invoices made abroad —false as to weight and otherwise—and that Browne, the examiner, when these invoices should get to him in the due course of business, should disregard his duty as an examiner, should neglect and omit to examine the goods covered by them as the law demanded, and should pass them along reporting the invoices to be correct so that, on the basis of his report, the entries might

be liquidated and the government deprived of its lawful duties. Five separate overt acts (three by the firm, two by Browne) were charged, and each was made the subject of a separate count.

Rosenthal forfeited his bail and did not appear, Cohn and Browne were tried together. The jury found each guilty as charged in the indictment with a recommendation to mercy as to Cohn. Subsequently, upon motion, the trial judge set aside the conviction of Cohn and granted him a new trial. In making this disposition of Cohn's conviction the judge filed an exhaustive discussion of the testimony (128 Fed. 615), which makes it unnecessary to rehearse the same here. It will be sufficient to refer to such of the 196 assignments of error as are of moment or have been pressed in argument upon the attention of the court.

The indictment sets forth that Rosenthal, Cohn, and Browne "before and on the thirtieth day of July, in the year of our Lord nineteen hundred and one, at the city of New York aforesaid, in the district aforesaid, unlawfully did conspire and agree together, and with divers other persons to the said grand jurors unknown, to defraud the said United States of large sums of money then legally due and to become due to the said United States, and which should have been paid by the said Abraham S. Rosenthal and Martin L. Cohn to the said United States, as duty upon divers importations of dutiable goods, wares, and merchandise into the said United States, from foreign countries, then made and thereafter to be made by the said Abraham S. Rosenthal and Martin L. Cohn at the port of New York, in the said district, which said unlawful conspiracy then and there was one which was to be effected in the manner following; that is to say: The said Abraham S. Rosenthal and Martin L. Cohn were to cause such goods, wares, and merchandise to be shipped from foreign countries consigned to them under the firm name of A. S. Rosenthal & Co., at the said port of New York, at which port they, the said Abraham S. Rosenthal and Martin L. Cohn, upon consular invoices containing, and known to them to contain, false statements as to the weight of the said goods, wares, and merchandise and false descriptions of the same goods, wares, and merchandise, were to make their written estimated entries of the said goods, wares, and merchandise at the custom house of the United States at the said city and port of New York, with the collector of customs at that port, upon their arrival, and when certain of the said goods, wares, and merchandise should according to law be designated and sent to the public stores at the said port for examination and appraisement, and when the same goods, wares, and merchandise, and the invoices accompanying the same, should be given to the said Charles C. Browne (who was then an examiner of imported merchandise at the said port) for examination and appraisement, he, the said Charles C. Browne, was thereupon to neglect and refuse to ascertain the true weight and nature of the said goods, wares, and merchandise, as it then and there was his duty under the law and under the practice at the said port to do as such examiner, and was, contrary to his duty as such examiner, to knowingly make false returns and reports upon the said invoices as to the weight and nature of the said goods, wares, and merchandise, to the end that in either case the said entries thereof and the duty upon the same should be, according to the practice at the said port, liquidated by the said collector upon the said returns and reports, and less than the amounts of duty legally due thereon collected by the said collector." The indictment then proceeds to set out the overt acts in separate counts.

Judson G. Wells and Louis Marshall, for plaintiff in error.

W. Wickham Smith, Special Asst. U. S. Atty. Gen.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). It was sought by plea in abatement to quash the indictment, upon the ground that W. Wickham Smith appeared before the grand jury on April 2, 1903, when the case was presented to that body and indictment

found. This point was first raised by a motion to quash. Attached to the motion papers was the following document:

"Department of Justice, Washington, D. C., March 26, 1903.

"W. Wickham Smith, Esq., New York—Sir: You are hereby appointed an assistant to the United States attorney for the Southern district of New York with compensation at the rate of $3,600 per annum. Your official residence is fixed at New York City. Before entering upon duty please execute the inclosed oath of office, returning it to this department.

"Respectfully,        P. C. Knox, Attorney General.

"Through Henry L. Burnett, Esq., United States Attorney, New York."

It is stated in the brief submitted for plaintiff in error that Smith took his oath of office as such assistant United States attorney on April 1, 1903, the day before the grand jury took up the cause, and that he resigned his position as assistant United States Attorney, having served six days as such, on April 6, 1903. The motion was denied, and the same objection subsequently renewed by plea in abatement, which plea was demurred to and demurrer sustained. The plea contains the averment that Smith, as an assistant to the United States attorney for the Southern district of New York continued his investigations and prosecution of defendant, and that "the written appointment of W. Wickham Smith as assistant to the district attorney is dated the 26th day of March, 1903, and that immediately after the finding of said indictment on April 2, 1903, the said W. Wickham Smith resigned from said office." Upon the face of the plea, therefore, it stands conceded that he was on the day in question an Assistant United States attorney for the district, and we know of no reason, and are referred to no authorities, which would sustain the proposition that there is any impropriety in such an assistant appearing before the grand jury to present a criminal cause to their consideration. No impropriety in his conduct or methods before that body is charged. Whether the government should have selected him as such assistant, in view of the fact that he had already familiarized himself with the case upon retainer by the Merchants' Association, which was making an investigation of customs frauds, whether the amount of the salary named, $3,600, was in excess of the statutory designation or of the appropriation, whether at the time of his appointment he was or was not counsel for individuals who had claims against the government, are questions wholly immaterial here. It stands conceded that he was an assistant United States district attorney. It is not contended that he misconducted himself in any way before the grand jury, and that is sufficient to dispose of the plea. It is wholly without merit.

The points principally relied upon in argument are directed to a criticism of the indictment—some 80 pages of the "brief" are devoted to that and to the plea. Quite naturally so, because a careful reading of the testimony in connection with the original exhibits satisfies us that the trial judge was entirely right in the conclusion (expressed in his decision on motion for new trial) that the evidence presented upon the trial by government "amounted to a demonstration that could have left no properly equipped mind unconvinced that there was a fraudulent scheme formed * * * for the purposes

of defrauding the government" of a portion of the duties accruing upon importations of A. S. Rosenthal & Co.

In criticism of the indictment it is contended that the United States "could not have been defrauded through the conspiracy set forth in the indictment, and therefore no crime is charged." The theory is this: The invoices and entries were to contain false statements as to weights, and were to be passed as correct by Browne, who is averred in the indictment to be "an examiner of imported merchandise at said port." Various statutes and treasury regulations are referred to as showing that the weighing of imported goods is to be done by officers known as "weighers"; wherefore, it is argued, Browne could not have "passed" the documents. This point was considered by the trial judge upon hearing of the demurrer to the indictment. We fully concur with him in the reasoning and conclusions expressed in his opinion (126 Fed. 766) and deem it unnecessary further to discuss the point.

It is further contended that the indictment is bad because it charges offense only in the language of the statute ("did conspire to defraud the United States") without setting forth the means proposed to be used to accomplish the purpose, and because it does not allege that the conspiracy was willful or corrupt, or that it was entered into with any criminal, willful, fraudulent, or corrupt intent. Examination of the argument in support of this proposition, as set forth in the brief in connection with the excerpt from the indictment quoted supra, shows that the criticism deals with words rather than substance. The theory is that the charging part of the indictment ends with the words "to be made by the said Abraham S. Rosenthal and Martin L. Cohn at the Port of New York, in the said district"; that the words "which said unlawful conspiracy then and there was to be effected in the manner following, that is to say," are a videlicet; and that the rest of the sentence down to and including "thereon collected by the said collector," which sets forth with sufficient fullness just what false invoices, false statements, false returns, and false reports were to be made, cannot be regarded as any part of the charge. If the charge were only that defendants did unlawfully conspire to defraud the United States of large sums of money to become due as duties upon divers importations by the firm, it might be fairly open to criticism as too vague and bald; but, under the broader and less hypercritical rules of construction which more modern authorities apply in criminal causes, and which have been followed in this circuit (U. S. v. Terry [D. C.] 39 Fed. 355, note by the court; Bromberger v. U. S., 128 Fed. 346, 63 C. C. A. 76), we cannot assent to the defendant's analysis of the sentence. We do not find in the quotation, supra, a videlicet, which cuts off the specific statement of the details of the conspiracy from the general language which states the statutory offense. Logically, practically, and grammatically the sentence conveys the same meaning as if it were expressed as it is now down to and including the words "at the port of New York in the said district," and then proceeded "by said Abraham S. Rosenthal and Martin L. Cohn causing such goods, wares, and merchandise to be shipped,

consigned to them," etc., etc. The whole sentence quoted, supra, in the statement of facts is the charging part, and in the indictment is followed by a further presentment of overt acts done in furtherance of the conspiracy therein set forth.

Many authorities are cited to support the propositions that no indictment is sufficient if it does not allege all the ingredients of the offense; that to make an agreement between two or more parties criminal it is not enough that the act is prohibited by statute, but the agreement must be entered into with a willful, fraudulent, or corrupt intent; that the words "unlawfully conspired" are not sufficient to charge such intent. The applicability of all such authorities to the cause at bar, however, is based upon the same analysis of the sentence which seeks to limit the charging part, as above indicated. Construed as a whole the sentence is not obnoxious to any criticisms in the cases cited. It is not necessary to repeat with every verb the words "willfully, fraudulently, and corruptly." One assertion of intent may be so made as to cover a joint specification of unlawful acts. Nor is there any exclusive force in any particular word indicative of intent, such as "corrupt," "fraudulent," etc. As is said in one of the cases cited by plaintiff in error, "the agreement must have been entered into with an evil purpose." People v. Powell, 63 N. Y. 88. The indictment sets forth the elements of the conspiracy: That the firm was to import goods upon consular invoices containing, and known to them to contain, false statements and false descriptions; that upon such invoices the firm were to make their entries at the custom house; that the examiner with goods and invoices before him was to make false reports, to the end that duty should be liquidated upon such false reports and "less than the amounts of duty legally due thereon collected by the collector [of the port]." Whoever framed this indictment would have saved court and counsel a great deal of unnecessary trouble, if he had been careful to insert an allegation that the agreement between the alleged conspirators as to what one or other of them should do to defraud the government of its lawful revenues was entered into with a corrupt and fraudulent intent. It is indeed unfortunate that, in preparing an indictment in a cause of this importance, more care was not exercised to present the essential elements of the charge in the plain and explicit phraseology which has been approved in so many decisions that all criticisms of the sort now under discussion would have been avoided. However, in the concluding clause last above quoted, there is, we think, sufficient to save the indictment. When it is said that some one does a certain act "to the end that" such and such a thing may happen, it is but another form of expressing the idea that he does it "with the intent" that such and such a thing shall happen. And when the intent is stated to be that the government should be hoodwinked into collecting less amounts of duty than are legally due to it from one or other of the alleged conspirators, it is not a violent construction which would hold such an intent to be fraudulent.

It is contended that the counts, other than the first, are bad because they do not allege that defendants unlawfully conspired and agreed

together for an unlawful purpose. The first count consists of the sentence quoted in the statement of facts, and of a further present-ment by the grand jurors that in pursuance of the said unlawful con-spiracy a certain overt act was committed. Each of the other counts presents a different overt act, but does not repeat in his verbis the presentment as to the conspiracy in pursuance and furtherance of which the overt act was committed. But each count does con-tain the statement: "The grand jurors do further present that in further pursuance of the said unlawful conspiracy in the first count of this indictment mentioned and described and to effect the object thereof," etc., etc. This is a sufficient reference to the first count "to incorporate the matter going before with that in the count in which [the reference] is made." See Blitz v. U. S., 153 U. S. 308, 14 Sup. Ct. 924, 38 L. Ed. 725, which holds that repetition may be avoided by referring from one count to another, a rule well-recognized by courts and text-writers. The reference expressly imports the de-scription of the conspiracy set forth in the first count, and is quite as effective as if it added the words, which plaintiff in error contends it should contain, "which is hereby made a part of this count."

Other objections: That the overt acts charged in the first three counts are not averred to be fraudulent; that Browne is charged not only with making false returns, but also with neglect and refusal to ascertain the true weight and nature of the goods; that the particular merchandise to be imported is not stated, nor the identity of the country or countries from which it was to come—are too unimportant to warrant discussion here. They were not touched upon in the ar-gument, and are without merit.

It is unnecessary to discuss the point raised as to the order in which peremptory challenges were exercised, and the jury was impaneled. The provisions of the state statute (section 385, Cr. Code N. Y.) are not controlling (Pointer v. U. S., 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208; Radford v. U. S., 129 Fed. 49, 63 C. C. A. 491), and we fail to see that the method pursued deprived the defendant of any substantial right—he was confronted with the jury while the chal-lenging was going on; he was not deprived of any of his challenges by reason of duplication with the government's, as happened in the extraordinary case relied on (Lewis v. U. S., 146 U. S. 370, 13 Sup. Ct. 136, 36 L. Ed. 1011); there were 12 men in the box when he was called on to challenge. The practice suggested that, before peremptory challenging begins, the defendant shall have the oppor-tunity to examine on voir dire not only those whose names have been drawn from the wheel and who have gone into the box, but also the entire panel from whom vacancies caused by challenges may be filled, is certainly novel in this circuit, and we know of no authority which constrains its adoption. The defendant's right of choice as to whom he shall challenge is sufficiently secured by his being provided in advance of the drawing with a list of the names and residences of the jurymen constituting the panel (and the subsequent panel of tales-men) from whom the 12 were to be drawn. The record shows that

defendants' counsel had been furnished with such a list. The objection that the jury was improperly selected is without merit.

Out of the enormous mass of objections to testimony gathered together in the printed brief of nearly 300 pages, it will be sufficient to deal with but three classes. A careful perusal of the record shows that there was hardly a document which did not come in under one or more exceptions reserved by the respective counsel for the two defendants, and it would be a waste of time to undertake to cover them all, or even those recited in the bill of exceptions. The indictment charged that the defendants conspired together "before and on July 30, 1901." This could not be sustained by evidence showing, as an act constituting with others the conspiracy, something done subsequent to that date. Upon that ground defendant objected to the introduction of certain false invoices of which one may be taken as a sample. It was dated Yokohama, August 9, 1901, and could not be received against Browne as direct proof of an act then done in furtherance of the conspiracy. But it had a further evidential value which made it competent, while the defendant's rights could be fully protected by instructions in the charge to the jury. If defendant did not think such instructions sufficiently full he might have asked for some more specific statement.[1] The charge in the indictment was that the firm were to procure shipments to be made from foreign countries upon false invoices. The jury were to ascertain whether the firm here had in fact done something which caused false invoices to be prepared in the foreign country, and there was evidence tending to show that they had. Yokohama is so far from New York that it is quite apparent that whatever was done here to procure the making of the false invoice there must have been done more than 10 days before the result was produced. The false invoice, therefore, of August 9th, while not admissible as itself an act done in furtherance of the conspiracy, was admissible as a fact from which the jury was entitled to infer, in connection with the other proof, that prior to July 30th the firm had given instructions that that particular invoice should be falsified in the way it was. And that act, the directing or setting in motion of the train of causes which produced the false invoice, was within the period covered by the indictment.

As to some other invoices also subsequent in date, the facts are as follows: On July 30th Browne was transferred from his position

---

[1]Defendant requested the court to charge: "No act or declaration by the defendants Rosenthal or Cohn after July 30, 1901, can be considered in determining whether the defendant Browne was on or before that day a party to the alleged conspiracy." To which the court replied: "I cannot charge that in that way. Yes. 'No acts or declarations actually made by Rosenthal or Cohn after July 30th can be considered against Browne; but the invoices that I have admitted in evidence—the original invoices that I have admitted in evidence—may be considered by you, although they are dated after July 30th, as enabling you to take a survey of the business of Rosenthal & Co., and provided these invoices were of such a nature that they might fall under the conspiracy if there was such, but what either of these men did after July 30th cannot be used against Browne.'" To this qualification of the request no objection was taken.

as examiner of silk goods to some other department, where A. S. Rosenthal & Co.'s entries and invoices would not come before him, and apparently on the same day the firm learned of the transfer. At that time there were goods afloat coming here with false invoices. As an instance: There were goods coming from Yokohama with an invoice dated July 8, 1901, which falsely stated their weight. Subsequent to July 30th the firm presented another invoice dated Yokohama August 15, 1901, covering the same goods and correctly stating their weight, which later invoice they asked to substitute for the earlier one. The later one added about 40 per cent. to weight. There were five similar instances of so-called substituted invoices. Now the making of the later invoice, and its presentation at the custom house, were in no sense acts done in furtherance of the conspiracy; quite the contrary, for their only tendency was to give the government a truthful statement as to the weight of the goods and to secure a liquidation at the true amount of duty. But these acts cast a vivid light upon the situation as it existed on July 8th, when the goods were first invoiced and started on the way from Yokohama. The circumstance that the firm, upon learning that their alleged co-conspirator was no longer at his post to cover up their frauds by false reports, was able to procure from the port of shipment an invoice which truthfully stated the weights, would tend strongly to induce the conviction that they knew before July 30th that their goods then afloat were coming here under false invoices. Their knowledge prior to July 30th was a material element in the case, and the subsequent making of a true invoice was competent evidence thereto.

Exceptions were taken to various items of evidence which related to certain experiments and calculations. Some time after Browne's removal, his successor found in a closet in his office a large number of samples of goods. To these there were pinned tickets in Browne's handwriting. The tickets were addressed to the Bureau of Analysis and were such as Browne would make in the regular discharge of his duties. About 100 of these tickets contained marks (A. diamond R. S. Co.) which indicated that they were Rosenthal's goods; they also contained the package number, entry number, and invoice number—all these marks and numbers being in Browne's handwriting. The samples were small, generally about the width of the goods, and some six inches in running length. Two expert examiners and analysts of this kind of goods, one from the appraiser's department in the Chicago custom house, the other from the like department in New York, cut off portions of these samples and made most careful measurements of the pieces cut off so as to determine their proportion to the full length of the piece of goods from which the sample came, on the basis of 50 yards for the length of the bolt or full piece, which the testimony showed was the standard length of the bolt of such goods. They next weighed the sample portions they had thus secured upon scales of extreme delicacy—the scale recorded to a one-quarter milligramme, about 1/150,000 part of an ounce. Having found the actual weight of the sample, they calculated what would be the weight of the whole piece. Having thus obtained a calculated

weight of the piece of goods, the number of which in Browne's handwriting was pinned to the sample, they turned to the invoice, which covered that piece. The invoice gave only the total weights of the several cases which it covered, and each case contained several pieces. They took the total invoice weight of the case which had contained the piece in question, and divided it by the number of pieces in the case, thus obtaining an average invoice weight per piece, which they took for purposes of comparison with the calculated weight of the piece as deduced from the sample. The comparisons, with apparently a single exception, show an excess of the calculated weights over the average weights, and in almost every instance an extremely large increase, no mere 5 or 10 per cent., but an "enormous discrepancy," to quote the language of appellant's brief—in many instances the full 40 per cent., which was proved to be the discrepancy in the instance where the goods, arriving after Browne's transfer, were weighed by other examiners. The weak points of this testimony are pointed out in the brief and are quite manifest. The samples were not found till some time after Browne's removal. In the interim it was possible for some enemy of himself or of Rosenthal to have shifted the tickets from one sample to another, or even to have affixed them to samples of goods which were not Rosenthal's at all, although no one from Rosenthal's store testified that a single sample represented goods which the firm were not importing at that time. The goods were handmade, not in factories, but in peasants' homes, not every piece being woven by the same hand, hence it might not be of identical weight throughout its entire length. Differences of pattern and differences of color produce differences in weight. Each piece is not exactly 50 yards in length; some will overrun, and some underrun, 2 or 3 yards. The cases contain goods of different colors and patterns, and sometimes of differing proportions of silk and cotton in their composition, although the goods in each case were of the same general character. All these criticisms, however, go to the credibility and weight of the evidence. Had the discrepancy shown been somewhat under 10 per cent., that circumstance might have left it so valueless as proof, even corroborative proof, that the court might quite properly have excluded it; but, on the record as it stands, the evidence was competent, it was not error to admit it for what it was worth, and the testimony sufficiently advised the jury of all the possible and probable sources of error in the calculation to enable them to estimate its weight, which was a question properly for them to determine upon all the testimony in the case. Counsel for the government states in his brief that the average deficiency of weight in the goods passed as correct by Browne, according to the calculations of these experts, was 38 2-5 per cent. We have not verified these figures, which presumably were used in argument to the jury; but when it is shown by uncontroverted proof that on the goods weighed in bulk, after Browne's transfer, by other examiners, the average excess of real weight over invoice weight was 39 3-5 per cent., and that when, after such transfer, the importers began making additions to weight on entry, the average of their additions was 39 1-6 per cent., it would

seem that the various inevitable errors one way and the other, which were to be expected in such a calculation, substantially balanced each other, as such errors generally do, when a sufficient number of items are taken under investigation to secure a fair average.

The other exceptions to admission of testimony need not be discussed, they present no ground for reversal.

Exception was reserved to refusal to advise the jury to acquit the plaintiff. Many of the grounds upon which this was based have already been disposed of, in connection with the demurrer and the admission of entries which arrived after July 30th. As to the contention, reiterated so often in the brief, that the evidence failed to connect Browne with the conspiracy, it is sufficient to say that, as was stated supra, the proofs were a demonstration to any intelligent mind that within the period in question there was a conspiracy by some persons to defraud the government of part of its customs duties, to the pecuniary benefit of Rosenthal & Co., by means of invoices containing false statements as to the weight and character of the goods. The falsity of an invoice could readily be detected by any one who had it, and the goods which came with it, before him. From January 1st to July 30th the person to whom the false invoices and the goods were to come was Browne. He might be absent occasionally for a day or so by reason of sickness or other cause, but Rosenthal invoices did not come every day, and upon the discovery of a single false invoice the worst to be anticipated would be the infliction of the penalty duty for undervaluation. The conspirators, however, if they had sense enough to conspire, must also have had sense enough to know that, if successive false invoices were presented to an official who made the examinations which his duties required, and transmitted truthful reports to his superiors, it was inevitable that the existence of a scheme to defraud the government would soon be discovered; and it was known that the official assigned by the customs authorities to make examinations and reports was Browne. Nevertheless, there were presented many invoices covering Rosenthal's goods, some of which were shown by uncontroverted proof to contain false statements, and as to others of which there was sufficient evidence to warrant the jury in finding that they also were false. When, in addition, it was shown affirmatively that in several instances Browne made false reports as to the percentage of silk in goods which he had submitted to the analyst, contrary to the analyst's report, with the effect of subjecting the goods to a lower classification and rate of duty, and in another instance certified as correct the invoice of a case actually in his hands, which contained four times as many pieces and a great deal larger weight and value than that set out in the invoice, it would have been a grave error in the trial court to have taken the case from the jury on any theory that Browne's connection with the conspiracy was not established by competent proof.

Touching refusals to charge as requested: The sixth request was modified as indicated, supra, in footnote. It is argued here that the modification was error, but no objection was made to such modification, and no exception reserved.

The court charged as requested:

"A conviction can only be had upon circumstantial evidence when the circumstances so distinctly point to the guilt of the accused as to leave no reasonable explanation consistent with the theory of innocence."

And also:

"To warrant a conviction on circumstantial evidence, the existence of inculpatory facts must be incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt."

Thereupon counsel requested the court to charge:

"The government having sought to sustain the charge against the defendants wholly by circumstantial evidence, before you are justified in convicting them, you must find that the facts and circumstances established by the evidence are not only consistent with, and point to their, guilt, but they are inconsistent with their innocence."

It was suggested, as an excuse for this requested reiteration, that it was taken from the language of some opinion of the New York Court of Appeals. But the trial judge was under no obligation to adopt the verbiage of any particular court. He had already fully and accurately set forth the rule of law applicable to the point, and quite properly refused to repeat it in a different form of words.

The sixteenth request was charged in part, in part refused, and the jury further instructed as to the point raised; but neither the refusal, nor the further instructions, were objected to, nor any exception reserved.

Exception was reserved to the court's refusal to charge:

"That, in cases depending upon circumstantial evidence, evidence of good character of itself creates a reasonable doubt, to which the defendant is entitled."

Inasmuch as it is necessary in criminal cases to convince the jury of defendant's guilt "beyond a reasonable doubt," the request was really for an instruction that no person of good cha--cter can be convicted of crime by circumstantial evidence, however strong. It is needless to say that this point on the brief is supported by the citation of no authority.

The other requests deal merely with comments asked for on details of the evidence suggesting to the jury what certain of the witnesses did or did not testify to and need not be considered.

Under the heading of errors in giving instructions to the jury, the brief quotes some sentences from the charge dealing generally with the failure of Browne on some occasions to follow the returns of the analyst, and criticizes them in several particulars. The objections advanced need not be considered. They are not legitimately before this court. After the charge was ended, counsel said: "I except to your honor's charge in the respect where you spoke of the duty of the examiner, and the obligation was upon him to follow the analyst." To this the court replied: "I did not say that. I took particular pains not to say it. I said it was his duty to return the goods according to the sample, so far as the sample applied to the goods that were passing under his examination." Thereupon counsel said: "I except."

So far as the last above-quoted remarks of the court are concerned, they correctly instructed the jury, and any exception to them would be wholly without merit. So far as the colloquium of the charge may have gone further as to any obligation of the examiner to follow the analyst, it was (if erroneous, which we do not now determine) fully corrected by the statement made when attention was called to it. So far as anything further in the charge is now complained of, neither objection nor exception called attention to it, and it cannot be here considered.

As to various other objections to portions of the charge, which are argued on the brief under point 23, subd. B, C, D, and E, it is sufficient to say that no exception was taken to them, or to any part of them. There was no error in refusing a new trial to Browne, and at the same time granting one to Cohn. The evidence certainly showed that more than one person participated in the corrupt understanding; that some one, who had power and authority to manipulate the invoices of A. S. Rosenthal & Co. and fill them with false statements, had conspired with the individual who was to pass upon those invoices. It might have been Cohn, or Rosenthal, or both, or one of them with the guilty assistance of others, and we fail to see how the finding of the court that the evidence was not sufficient to identify Cohn as the guilty party changes the situation. The evidence certainly warranted a verdict that Browne conspired with one or more persons, unnamed or unknown, who were to prepare false invoices, to defraud the United States.

The judgment of conviction is affirmed.