BELFI et al. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. June 18, 1919.)

No. 2411.

1. MONOPOLIES ⬥⬥12(2)—ANTI-TRUST ACT—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE.

A combination between members of a tile dealers' association to exclude trade competitors from membership and to make it impossible for them to obtain tiles or tile setters by refusing to buy tiles from manufacturers, most of whom are located in other states, who sold to such competitors, and by an agreement with the tile settlers' union that the latter would not allow its members to work for nonmembers of the association, *held* to directly affect interstate commerce, in violation of Sherman Anti-Trust Act, § 1 (Comp. St. § 8820).

2. CRIMINAL LAW ⬥⬥910—EFFECT OF GRANTING NEW TRIAL TO CERTAIN DEFENDANTS.

Where several persons, tried together, have been convicted of a conspiracy, the granting of a new trial to certain of the defendants, against whom there was no evidence, and who were not shown to have said or done anything which could be prejudicial to their codefendants, does not confer upon the others the right to a new trial.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Criminal prosecution by the United States against A. P. Belfi, Constantine Belfi, Angelo Trevisan, and seven others. Judgment of conviction, and defendants bring error. Reversed as to defendants Trevisan and Constantine Belfi, and affirmed as to the other defendants.

Edward J. Mingey, Frank M. Cody, and Harry M. McCaughey, all of Philadelphia, Pa., for plaintiffs in error.

G. Carroll Todd and Ernest Harvey, Asst. U. S. Attys., and Henry S. Mitchell, Sp. Asst. Atty. Gen., for the United States.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

WOOLLEY, Circuit Judge. The defendants were convicted in the court below under an indictment preferred against them at the in-

stance of the United States for engaging in a conspiracy to restrain interstate trade and commerce, in violation of the act of Congress, entitled, "An Act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (26 Stat. 209, c. 647 [Comp. St. § 8820]). After sentence, the defendants sued out this writ of error and now raise several questions for review, the principal one being, whether the evidence sustains the conviction, and whether, accordingly, the trial court erred in denying a motion to direct a verdict of acquittal. The determination of this question involves another, which concerns the conduct of the defendants in combining as members of a trade association to refrain from business dealings with others who deal with non-member competitors, raising the issue, whether the restraint of interstate trade and commerce resulting therefrom, if any, was so indirect and remote as not to be within the offence of the statute.

[1] The industry out of which this controversy arose is the tile industry. In it are engaged three classes of persons, tile manufacturers, tile dealers, and tile setters. The part taken by each class is fairly indicated by its name. The business of tile dealers, as conducted in Philadelphia, is of a character that does not require them to keep tiles in stock. It consists chiefly in making bids on proposals, and, when their bids have been accepted and contracts have been entered into, tiles of the kinds specified are then procured from tile manufacturers and are put in place by tile setters employed by the tile dealers.

The defendants, who are tile dealers engaged in the retail tile business in Philadelphia and vicinity, had joined together and associated themselves in a trade organization known as the Philadelphia Tile, Mantel & Grate Association, ostensibly for the correction of trade abuses and evil practices and the promotion of sound business policies. This association, though admittedly a trade combination, was not regarded by the trial court to be in and of itself a combination violative of the federal statute against unlawful restraints and monopolies. The controversy, therefore, concerns not the unlawfulness of the combination but the unlawfulness of the conduct of some of its members in carrying out its conceivably lawful purposes. This conduct consisted, as it is alleged by the indictment, in excluding trade competitors from membership in the association, in the refusal of association dealers to buy tiles from manufacturers that sold tiles to non-member dealers, and in entering into agreements with a tile setters' labor union, whereby association dealers obtained from the union, first, a preference over non-member dealers in the employment of union tile setters, and, second, a promise by the union to supply no tile setters to tile dealers outside of the association, thereby creating a boycott of non-member tile dealers by making it impossible for them to get materials for their business and labor with which to carry it on.

Turning to the evidence, we find that a written contract was formally entered into between the association and the union covering hours of labor, wage scale, and other matters not pertinent to this issue. It included also provisions whereby members of the association

agreed that they would employ none but members of the labor union, and the union in return agreed that it would give preference to requests made by association dealers for tile setters over similar requests made by non-member dealers. That these provisions were contained in the agreement and were carried out by the parties is conceded. The defendants maintain, however, that this agreement and its literal performance constitute the whole of their conduct, and as this conduct affected interstate commerce only remotely, if at all, the trial court should have acquitted them of the charge of offending against the statute.

If this were all the testimony, we would have little difficulty in concurring in this view, for, manifestly, restraint of interstate commerce resulting from such an agreement would not be of that direct character which the courts have interpreted to be within the meaning of the statute. But there is other testimony, which, if believed, gives the case a different aspect.

It is admitted by the defendants that the association endeavored to write into the contract between itself and the union a reciprocal provision whereby the union would agree not to allow its members to work for dealers outside the association in consideration of the undertaking of the association not to employ setters outside the union. To this provision, it is conceded, the union did not agree —in writing. But it is in evidence (though denied by the defendants) that the association and the union entered into an oral contract to this effect at the same time they entered into the written contract. In operating under the two contracts, there is evidence quite sufficient for a jury to find that the association, representing about 90 per cent. of the tile dealers, and the union, comprising nearly all the tile setters in Philadelphia and vicinity—the latter being described as "close to 100 per cent. organization"—so cooperated that non-member dealers could not employ tile setters. Being blocked in obtaining labor, there is evidence that non-member dealers were as effectually blocked in obtaining materials for their business because of the endeavor by some association members to induce union setters, through the union, to refuse to set tiles sold by manufacturers to non-member dealers, and because of the refusal of tile manufacturers to sell tiles to non-member dealers under the threat of association dealers that they would not buy tile from them if they sold to dealers outside the association. As all' tile manufacturies in the country, save one, are located in states other than the state of Pennsylvania, an interference with commerce caused by the refusal of tile setters to set tile and of tile manufacturers to sell tile is necessarily interstate in character. The jury having found that the defendants had by their acts restrained commerce, and that restraint being of commerce that was interstate in character, the only question for us to decide is, whether the restraint to interstate commerce thus occasioned by the defendants, was so indirect and remote that the trial judge should have declared as a matter of law that it was not such restraint as is contemplated by the statute.

The determination of this question turns on familiar principles repeatedly declared by the courts and stated nowhere more clearly perhaps than by the Supreme Court in Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, and Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300. These cases are cited by the defendants as presenting facts analogous to the facts of this case, and are confidently relied upon as ruling this case on the law.

Hopkins v. United States and Anderson v. United States were companion cases arising out of the manner in which business was conducted in the stock yards at Kansas City. The business of the stock yards was transacted by members of two exchanges and also by persons who were members of neither exchange. The Kansas City Live Stock Exchange (under consideration in the Hopkins Case) was an association of commission merchants. The rules of this association forbade members buying live stock from commission merchants of Kansas City not members of the exchange, and forbade members transacting business with any person violating its rules and regulations. The Traders' Live Stock Exchange (under consideration in the Anderson Case) was, as its name denotes, an association of yard traders, men who speculated in live stock. The articles of association of the Traders' Live Stock Exchange forbade its members recognizing any yard trader unless he was a member of the exchange, and forbade any member of the exchange purchasing cattle from a commission merchant who sold or purchased cattle from any yard trader who was not a member of the exchange. The main difference between the two exchanges was that the members of the Traders' Live Stock Exchange being traders, were themselves purchasers of cattle on the market, while the members of the Kansas City Live Stock Exchange were commission merchants who received cattle by consignment and sold them on commission. The purposes of the two exchanges being kindred, the Government charged that the association of commission merchants in one case and of yard traders in the other were combinations in restraint of interstate trade violative of the statute.

In each of these cases, the Supreme Court very carefully pointed out that there was no evidence of any act on the part of the defendants preventing access to the yards or preventing purchases and sales of cattle by anyone, other than as such sales were prevented by the mere refusal on the part of the defendants to do business with non-members in a manner violative of the rules of their respective exchanges, and that there was no evidence that the defendants had in any manner "other than by the rules mentioned hindred or impeded others in shipping, trading or selling their stock, or that they had in any way interfered with the freedom of access to the stock yards of any and all other traders and purchasers, or hindered their obtaining the same facilities which were therein offered by the stock yards company to the defendants as members of the exchange." After acquitting the defendants of all acts violative of the statute, save their membership in the exchanges, the court proceeded to consider and pass upon the articles of association by which the members of the

two exchanges were bound as contracts creating combinations or monopolies in violation of the statute. This was the single issue.

The law of these cases, having to do only with the lawfulness of the articles of association of the two exchanges, would, we surmise, bear directly on the case at bar, if, as the defendants here maintain, it involved nothing more than the articles of association and the written contract between the association and labor union. But the case at bar differs substantially from the cases cited, in that it contains evidence of acts on the part of some of the defendants, aside from subscribing the articles of association and complying with the written labor contract, which prevented access to the tile trade of Philadelphia and vicinity by tile manufacturers of distant states, and prevented purchases of their tiles by non-member tile dealers in Philadelphia, because of the penalty imposed upon tile manufacturers in distant states for selling to non-member dealers and of the impossibility of non-member dealers getting their tiles laid by local union tile setters. If there had been in the Hopkins and Anderson Cases acts of the defendants analogous to these, whereby, for instance, the members of the two exchanges had so acted as to prevent cattle men in distant states from shipping cattle to Kansas City and selling them there, or had contracted with stock yard union laborers not to handle cattle consigned by non-resident cattle men to non-member commission merchants, or not to handle cattle sold by non-resident cattle men to non-member traders, then, we apprehend the Supreme Court might have regarded these cases differently and might have found that the direct, immediate and inevitable effect of such acts was to restrain commerce in cattle between the states. It is not necessary to repeat or review in this opinion the elaborate discussion of the law on the subject pursued by the Supreme Court in the opinion in the two cases cited. It is sufficient to say that we believe the acts charged against the defendants named in the judgment now under review—over and beyond the articles of association by which they were bound and the written contract with the labor union into which their association had entered—were such, if committed, as did have a direct and immediate effect upon interstate commerce in tiles, resulting in its unlawful restraint.

If, however, the Hopkins and Anderson Cases raise a valid doubt on this point, that doubt is assuredly set at rest by the later decisions in Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, and Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, in which the Hopkins and Anderson Cases are distinguished.

In the Eastern States Lumber Association Case, the Supreme Court, in quoting from Gompers v. Buck Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, stated the law which we regard as applicable to this case. It is as follows:

"It [the Sherman Act] covered any illegal means by which interstate commerce is restrained, whether by unlawful combinations of capital, or unlawful combinations of labor; and we think also whether the restraint be occasioned by unlawful contracts, trusts, pooling arrangements, blacklists, boy-

cotts, coercion, threats, intimidation, and whether these be made effective, in whole or in part, by acts, words, or printed matter."

In quoting this law from the opinion in Gompers v. Buck Stove & Range Co., the Supreme Court evidently regarded it as apposite to the case of Montague & Co. v. Lowry, for it cited that case in conjunction with the quotation. The Lowry Case on the facts is singularly like the case at bar. In the Lowry Case, the Tile, Mantel & Grate Association of California differed from the Philadelphia Tile, Mantel & Grate Association in the instant case chiefly in the fact that in the former case both resident tile dealers and non-resident tile manufacturers were members of the association, the tile manufacturers being bound by its articles not to sell tile to non-member dealers on penalty of forfeiting their membership and with it their trade; while in this case, non-resident tile manufacturers were not members of the association, yet were induced, under threats from members of the association, to refuse to sell tiles to non-member dealers. Non-resident tile manufacturers were thus prevented or hindered, either by membership agreement with tile dealers in one instance or by threats made by tile dealers in the other, from selling tiles to any dealers outside the association. The effect on interstate commerce was precisely the same in both instances.

Reviewing the evidence in this case in the light of the law declared by the decisions of the Supreme Court, we cannot find that the trial judge committed error in submitting the case to the jury.

Judgment was entered on verdict against all defendants, twenty-one in number. In the theory or in the strategy of their defense at the trial, the defendants did not make separate defenses, but joined in a manner that indicated their willingness to stand or fall together. In consequence, the trial judge in his charge treated the defendants generally, not individually. After conviction, all joined in a motion for a new trial, and at the argument, each defendant urged his separate ground, which, in some instances, was just such a defense as he separately could have made at the trial. As it was not charged that the association was in and of itself an unlawful combination, the trial judge found on the motion for a new trial that there was only slight evidence beyond that of membership in the association against eleven of the defendants. To these defendants he granted a new trial, and entered judgment on the verdict against the remaining ten. From this action of the trial judge in granting the motion for a new trial as to some defendants and denying it as to others, the defendants, whose motion was refused and who are in this court on writ of error, raised two questions at the argument outside the assignments of error.

The first question has to do with the correctness of the judge's selection of defendants to be awarded a new trial on the ground of insufficient evidence to sustain the verdict as to them. Certain of the plaintiffs in error contend that with respect to them also there was a like lack of evidence. As the action of the trial judge in granting the motion with respect to some of the defendants was not opposed by the Government—indeed, the Government assisted the judge

in separating the defendants—we feel that we should follow the principle on which he acted by inquiring into the evidence and discovering whether there were others against whom there was the same lack of evidence as against those granted a new trial, being particular, however, to avoid even the appearance of recognizing a right in an aggrieved party to assign as error the ruling of a trial judge on a motion for a new trial. As we cannot very well decline to do what the trial judge did in separating the defendants against whom there was not sufficient evidence to sustain the conviction from those against whom there was sufficient evidence, we have of our own motion given this aspect of the case careful consideration and are of opinion that Angelo Trevisan and Constantine Belfi should have been included in the group awarded a new trial.

[2] The other question arising out of the action of the trial judge on the motion for a new trial was not presented to him and was raised for the first time at the argument on this writ of error, without an assignment of error. It is: Whether the judgment should be reversed against the defendants embraced in it, on the ground that, where several persons have been convicted of a conspiracy, a new trial cannot be granted to some of the conspirators without granting it to all.

It should be noted on the threshold of this discussion that this contention was not addressed to the trial judge and that no exception was taken to his action in granting a new trial to some of the defendants. If the action of the trial judge were error, he should have been apprised of his error when he committed it and he should have been afforded an opportunity to correct it by an appropriate exception seasonably made. United States v. United States Fidelity Co., 236 U. S. 512, 529, 35 Sup. Ct. 298, 59 L. Ed. 696; Guerini Stone Co. v. Carlin Construction Co., 248 U. S. 334, 348, 39 Sup. Ct. 102, 63 L. Ed. 275; Fillippon v. Albion Vein Slate Co., 250 U. S. 76, 39 Sup. Ct. 435, 63 L. Ed. ——. Counsel for the defendants did not do this for several conceivable reasons. They might not have noticed the alleged error; or noticing it, they might not have cared to take the risk of the trial judge refusing the motion as to all defendants, which the trial judge might properly have done in view of the position which the defendants took at the trial of standing or falling together; or they might not have desired to lose the advantage of the clearly indicated inclination of the judge to resolve doubts as to the evidence in favor of certain of the defendants when its insufficiency was debatable. Ordinarily we would require the parties to abide the consequences of their manœuvre, but as this is a criminal case, with all the implications and consequences of cases of that class, we have of our own motion given this question consideration and shall dispose of it as though it were properly before us.

Counsel for the defendants who were denied a new trial rely on Commonwealth v. McGowan, 2 Parsons' Selected Equity Cases, 341, to sustain their position. We have not had access to the volume in which this case is reported, but, from the part of the opinion which counsel have quoted at length, it is quite clear that the rule applied in that case is not applicable to this case. The basis of that decision seems

to be, that when a conspiracy has been proven, what one of the conspirators said or did is regarded as evidence against the others, and that, as the court cannot know the bearing which the evidence of words and acts of one might have had in procuring the conviction of the others, a new trial, if granted, should be granted to all. But when, as in this case, there is no evidence at all to connect some of the defendants with the conspiracy and there is evidence to connect others, and when, as in this case, there is no evidence that those who were granted a new trial said or did a single thing that could implicate those who were not granted a new trial, it is not reasonable to assume that the lack of evidence to convict those granted a new trial could in some conceivable way have contributed to the conviction of the others. The only evidence introduced to connect those who were granted a new trial with the conspiracy was their membership in the association and their presence at the meetings. As they spoke no words and did no acts to implicate themselves, manifestly, they could not have implicated the others. The question which confronted the' trial judge on the application for a new trial was, whether there was evidence which would sustain the conviction against all. As to certain named defendants he found the evidence insufficient. While the same evidence showed that the remaining defendants were similarly members of the association and present at its meetings, there was additional and cogent evidence that they were actors in the conspiracy and were the ones who had violated the statute. If the situation had been reversed, and a new trial had been granted those who were refused a new trial and a new trial had been denied those who were granted a new trial, then, there would perhaps be merit in the defendant's contention, for then it could be said that the evidence of the sayings and doings of the actors thus granted a new trial may have been the very evidence on which those who were denied a new trial were convicted.

The rule of law on which counsel for the defendants rely, namely, that, "where two or more persons have been convicted of a conspiracy, it is not possible to grant a new trial as to one and not as to the others," for which they find support in the opinion of the cited case, cannot be the general rule applicable to all cases without regard to their circumstances. In fact, such a rule, general and applicable to all cases, is not supported by authority. In United States v. Cohn, 128 Fed. 615 (C. C. S. D. N. Y.), one Cohn and one Brown—there having been a severance as to Rosenthal, the other alleged conspirator—were convicted of a conspiracy to defraud the United States in respect to import duties. Each defendant moved for a new trial. The motion was allowed Cohn and denied Brown. In disposing of the motion Judge Thomas (128 Fed. 626) said:

"Upon the authority of Regina v. Gompertz, 6 Pa. Law J. 377, Commonwealth v. McGowan, 2 Par. Equity Cas. 341, and Dutcher v. State, 16 Neb. 30, 19 N. W. 612, it is urged by counsel for Brown that a new trial for Cohn must result in a new trial for Brown. These cases do not seem in point. Cohn is granted a new trial because no cause of action was proved against him, and the indictment should have been dismissed as to him by the court. Had such

dismissal been ordered, nevertheless Brown's case could have been submitted to the jury."

This ruling was expressly affirmed by the Circuit Court of Appeals for the Second Circuit (Browne v. United States, 145 Fed. 1, 76 C. C. A. 31); Judge Lacombe saying (145 Fed. 13, 76 C. C. A. 43):

"There was no error in refusing a new trial to Brown, and at the same time granting one to Cohn. The evidence certainly showed that more than one person participated in the corrupt understanding; that some one, who had power and authority to manipulate the invoices of A. S. Rosenthal & Co. and fill them with false statements, had conspired with the individual who was to pass upon those invoices. It might have been Cohn, or Rosenthal, or both, or one of them with the guilty assistance of others, and we fail to see how the finding of the court that the evidence was not sufficient to identify Cohn as the guilty party changes the situation. The evidence certainly warranted a verdict that Brown conspired with one or more persons, unnamed or unknown, who were to prepare false invoices, to defraud the United States."

A certiorari in that case was denied by the Supreme Court (200 U. S. 618, 26 Sup. Ct. 755, 50 L. Ed. 623). We can see no distinction between the case at bar and the Cohn Case.

Our conclusion, therefore, is, both on reason and authority, that the granting of a new trial to certain of the defendants in this case does not confer upon the others a right to a new trial.

We direct that the judgment below be affirmed with costs as to all defendants except Angelo Trevisan and Constantine Belfi, and as to them the judgment be reversed with their costs and a new trial granted.