# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1783

_____

Yasmin A. Shoaira; Hesham Gawdat    *
Tobar,    *
   *
       Petitioners,    *
   *   Petition for Review of an Order
     v.    *   of the Board of Immigration Appeals.
   *
John Ashcroft, Attorney General of the    *
United States of America,    *
   *
       Respondent.    *

_____

Submitted: May 13, 2004
Filed: July 26, 2004

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

      Yasmin Shoaira and Hesham Gawdat Tobar petition for review of separate decisions of the Board of Immigration Appeals denying their applications for asylum and withholding of removal.

I.

## A. Factual Background

Shoaira and Tobar are a wife and husband who seek asylum in the United States because they fear persecution based on their religious beliefs, imputed political beliefs, and membership in a particular social group if returned to their home country, Egypt. Tobar came to the United States on September 4, 1988 as a visitor for pleasure and stayed beyond the date authorized by his visa. Shoaira came to the United States on September 28, 1994 to marry Tobar, who is her cousin. She also entered as a visitor for pleasure and overstayed her visa.

The Immigration and Naturalization Service (INS) began deportation proceedings against both petitioners separately in successive months. The INS filed a Notice to Appear in the Immigration Court for Tobar on December 8, 1997. It filed a Notice to Appear for Shoaira on January 24, 1998. An IJ subsequently joined their cases. Both Shoaira and Tobar conceded deportability before the IJ, but applied for asylum and withholding of removal. The IJ held a joint asylum hearing on August 18, 1998 and took the testimony of both petitioners and a psychologist who had treated Shoaira at the Center for Victims of Torture.

The petitioners base their claim to fear of future persecution on events that occurred to Shoaira's father, Abdulmann Shoaira, who is also Tobar's uncle. Tobar and Shoaira testified that Abdulmann Shoaira is a devout Muslim who dresses and grooms himself in strict accordance with Muslim traditions. He wears a long beard and distinctive clothing that identify him as a traditional Muslim. According to the petitioners, the Egyptian government believes his dress and grooming mark him as a fundamentalist Muslim with particular political views regarding the acceptability of Egypt's secular government.

According to both petitioners, Abdulmann Shoaira suffered four arrests largely on the basis of his appearance. The first arrest occurred in 1981. The authorities suspected Abdulmann Shoaira of involvement in the assassination of President Anwar Sadat. Shoaira, who was five years old at the time, testified that there was no particularized suspicion of her father, but that the authorities had picked up anyone with a beard. There was conflicting evidence on this point, however, as Tobar claimed Abdulmann Shoaira was suspected because he once wrote a letter to Anwar Sadat criticizing the Egyptian government. Abdulmann Shoaira was arrested a second time in 1984. On this occasion, the police came to the Shoaira home at night, harassed her family, and took her father away. When Shoaira tried to take shoes to her father that night, a police officer pushed her to the ground. According to Shoaira, her mother succumbed to mental illness after this event. In 1990, the police again arrested Abdulmann Shoaira. On this occasion, Shoaira testified, the authorities detained him for four or five months. The final arrest occurred in 1994, after Abdulmann Shoaira returned to Egypt from delivering his daughter to the United States for her wedding to Tobar. According to Shoaira, the police detained her father for four or five days, questioning him about the reason for his trip. She also said they tried to get her father to persuade Tobar to return to Egypt. The petitioners claim the authorities questioned Abdulmann Shoaira about Tobar's views and activities during that detention.

Tobar testified that his father-in-law now lives in Europe, where he works as a kind of merchant marine. He says that membership in certain revolutionary Islamic fundamentalist groups is an offense in Egypt, punishable by life in prison. Both petitioners deny that Abdulmann Shoaira ever had any connection to such groups. They say that the Egyptian government's inference from his grooming to his politics was faulty.

The petitioners relate few incidents of government mistreatment they have experienced in their own rights. Shoaira admits that she was never detained by the

police. She claims to have suffered psychological damage from experiencing the police arrests of her father, and her therapist provided supporting testimony on this point. Shoaira also claims that she was pushed to the ground by police during her father's second arrest. Tobar claims that he was detained on two occasions. When he was seventeen years old, authorities detained him upon his return from a trip to Yemen. Later, while in college, the police detained Tobar for six hours. He concedes that these incidents are not past persecution. Nevertheless, he believes that the authorities keep a file on him because his father-in-law's visit drew Tobar to their attention.

B.      Asylum Hearing

During the asylum hearing, the IJ at times adopted a hostile demeanor with the petitioners. He stated that "I am one of those judges that is not the least bit interested with the process. I don't care about the procedure. I don't care about the process here. It's all for show." App. of Petitioners ("App.") at 32. Beyond dismissing procedural safeguards, he also treated the petitioners in a combative fashion. As he stated at the hearing, "I've got to challenge you with some tough questions and turn your own answers back against you." App. at 71. Later, he explained that "when people are angry they usually tell me the truth." App. at 144. The IJ peppered the hearing with remarks he apparently meant to throw the petitioners off their story, if it was concocted.

The IJ held that neither Shoaira nor Tobar had established that they had experienced past persecution directly. Respecting Shoaira's first-hand experiences, the IJ wrote, "the Court fails to see that the Egyptian government, while they certainly may have caused [Shoaira's psychological disorders], intended to persecute her at the same time they were mistreating her father." App. at 11. In essence, the IJ held that though the Egyptian police may have been persecuting her father in making these arrests, they were not persecuting Shoaira, notwithstanding the fact that she incurred psychological damages.

The IJ ruled that neither petitioner could base a well-founded fear of future persecution on the experiences of Shoaira's father alone. The IJ did not make any explicit credibility determination, but appeared to accept that the facts were as the petitioners presented them at the hearing.

The IJ, assuming without deciding that the arrests of Abdulmann Shoaira constituted persecution, also held that his treatment was not based on his religious beliefs. He wrote, "[t]he Court would not be able to state that he was persecuted for religious reasons, because Egypt is, according to the documents in the record, officially an Islamic country and while the Egyptian government may be a little secular for some of the more extreme Muslim Fundamentalists, nevertheless, the government has no history of persecuting people simply because they are Muslim." App. at 11. Thus, the IJ concluded that the State Department Report's evaluation of Egypt outweighs the petitioners' attributions of motive to the government actors. The religious aspect of Abdulmann Shoaira's treatment arises only because people of a certain type of religious belief often advocate a certain political view—that secular governments should be overthrown in favor of Islamic states.

The IJ also rejected imputed political belief as a basis for the father's persecution, and by extension as the basis for the petitioners' fear of future persecution. Basing its opinion on country conditions reports, the IJ stated that Egypt tolerates a fair amount of dissent in the form of opposition newspapers. He also noted that the petitioners were unable to express the particular views they thought the government attributed to them based on Shoaira's father's opinions. The IJ held that the petitioners had not met their burden of proving that they had a well-founded fear of future persecution based on political belief.

Finally, the IJ rejected the claim that the petitioners reasonably feared persecution based on their family membership, which they claim to be a "social group" under the asylum statute.

Finding no basis to fear persecution for a protected activity, the IJ denied Shoaira's and Tobar's applications for asylum. It also held that the applications for withholding of removal failed as a matter of course. Finally, the IJ granted the petitioners' applications for voluntary removal.

The BIA affirmed the IJ's decision in separate orders without opinion. We have jurisdiction to review the BIA's decision under 8 U.S.C. § 1252.

II.

The petitioners argue that the BIA mistakenly applied its streamlining procedures in disposing of their appeals. We review this decision for an abuse of discretion. Dominguez v. Ashcroft, 336 F.3d 678, 680 (8th Cir. 2003). The BIA does not abuse its discretion in adopting without opinion the decision of an immigration judge. Id. An agency must set out the basis of its adjudicatory decisions, but the IJ's decision fulfills this agency obligation. Id. Nor do the regulations violate due process. Loulou v. Ashcroft, 354 F.3d 706, 708 (8th Cir. 2003) (amended Apr. 28, 2004). Consequently, the BIA's use of its streamlining procedures was not improper, and we will review the substance of the IJ's decision directly.

III.

The petitioners argue that the IJ deprived them of their due process rights by conducting their asylum hearing in a hostile manner. They argue that the IJ deprived them of a fair hearing by ignoring proper procedure and preventing them from testifying fully. We review constitutional challenges to immigration proceedings *de novo*. Escudero-Corona v. INS, 244 F.3d 608, 614 (8th Cir. 2001).

To support their position, the petitioners rely on Podio v. INS, 153 F.3d 506 (7th Cir. 1998), and Colmenar v. INS, 210 F.3d 967 (9th Cir. 2000). In Podio, the Seventh Circuit held that an immigration judge had violated an petitioner's due

process rights by taking over the questioning from his attorney, repeatedly and forcefully interrupting his testimony, and refusing to allow his siblings to corroborate his story with their own testimony—notably, testimony that had earned the siblings grants of asylum in the United States. 153 F.3d at 509-11. The Seventh Circuit held that due process requires that deportation hearings be "conducted in a fair enough fashion for one to determine that the BIA's decision was based on reasonable, substantial, and probative evidence." Id. at 509. For a deportation hearing to be fair, an IJ must allow a reasonable opportunity to examine the evidence and present witnesses. Id. In Colmenar, the Ninth Circuit upheld a due process challenge to asylum proceedings where the immigration judge stated before the hearing that he "had no idea what the basis for the claim is," and refused to allow an applicant to testify about anything in his written application. 210 F.3d at 971. The Ninth Circuit determined that the immigration judge prejudged the application and prevented the petitioner from presenting evidence to support his application. Id. at 971-72.

This case has no point of contact with either Podio or Colmenar. The petitioners point to several ill-conceived remarks of the IJ that suggest he was hostile to their claim. For example, near the beginning of the hearing, the IJ said, "I am one of those judges that is not the least bit interested with the process. I don't care about the procedure. I don't care about the process here. It's all for show." App. at 32. Taken in isolation and coming from a judge, this language is deplorable. However, the comment and the few others like it scattered through the transcript do not work any prejudice against the petitioners. The IJ's immediately subsequent comments are revealing: "What I'm interested in is substance. . . . And, substance can be presented to me in five or 10 minutes. I've granted asylum cases in less than 15 minutes if they're good cases. . . . I don't need paperwork. I don't need a lot of stuff. I just need the facts, good solid, dependable facts. That's all I need." Id. at 32. Also revealing is the context. The petitioners sought to provide the testimony of a therapist who treated Shoaira for problems she traces to witnessing her father's mistreatment by Egyptian authorities. The IJ questioned the relevance of the testimony to the asylum claim and admonished the petitioners not to waste their time on irrelevancies. In the

end, however, the IJ allowed the therapist to testify, and her testimony occupies fully fourteen pages of the hearing transcript. The IJ was respectful of and engaged with the testimony, and the petitioners were able to establish that Shoaira suffered, and suffers still, from witnessing the arrests of her father.

It is telling that the petitioners point to no evidence that the IJ's conduct discouraged or prohibited them from providing. To prevail on a due process challenge, an asylum applicant must show prejudice. Roman v. INS, 233 F.3d 1027, 1033 (7th Cir. 2000). The petitioners allege no specific prejudice; they claim only a generalized disability to testify fully. Even this general complaint misrepresents the overall tenor of the hearing. While the IJ asked pointed questions and at times questioned the witnesses at length on his own, his questions were respectful and when he finished asking them, he allowed the petitioners' attorney to ask further questions, at one point stating, "Counselor, I'm sorry I kind of stole your thunder there. If you want to go ahead and pick-up." App. at 72. Immigration judges have broad discretion to control the manner of interrogation to get at the truth. Podio, 153 F.3d at 509. We find that the IJ's conduct at the asylum hearing in this case was acceptable.

IV.

Finally, the petitioners challenge the IJ's determination that they are not refugees who qualify for asylum or withholding of removal. We review the IJ's denial of asylum for an abuse of discretion, and the factual findings underlying that decision for substantial support by the record considered as a whole. Manivong v. Dist. Dir., U.S. Dep't of Justice INS, 164 F.3d 432, 433 (8th Cir. 1999). The IJ's factual determinations "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." Wai Ling Tang v. INS, 223 F.3d 713, 718 (8th Cir. 2000) (citations and quotations omitted). Reversal is appropriate only if the applicant shows that the evidence was so compelling that no

reasonable fact-finder could fail to find the requisite fear of persecution. Kratchmarov v. Heston, 172 F.3d 551, 554 (8th Cir. 1999).

The Immigration and Nationality Act ("INA") authorizes the Attorney General, in his discretion, to grant asylum to anyone who qualifies as a refugee. 8 U.S.C. § 1158(a). The INA defines "refugee" as an alien who is not willing to return to her country of origin due to "past persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The "well-founded fear of persecution" standard contains a subjective element and an objective element. An applicant for asylum may establish the subjective element with credible testimony that she genuinely fears persecution. Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir. 1993) (citations omitted). The element of objective fear requires a showing of credible, direct, and specific evidence that a reasonable person in the applicant's position would fear persecution if returned to her country of origin. Id.

"Past persecution is relevant either because it provides a basis for a well-founded fear of future persecution, or, in extreme cases, because the severity of past treatment may form part of a compelling reason for the alien's unwillingness to return to the site of such persecution." Fisher v. INS, 291 F.3d 491, 497 (8th Cir. 2002). If an applicant establishes past persecution, she is entitled to the presumption that her fear of future persecution is well-founded. Perinpanathan v. INS, 310 F.3d 594, 598 (8th Cir. 2002). "Persecution involves a threat to one's life or freedom on account of one of five protected grounds—race, religion, nationality, membership in a particular social group, or political opinion." Fisher, 291 F.3d at 497.

Neither Shoaira nor Tobar can establish past persecution. Only Shoaira claims that she herself suffered persecution; Tobar concedes that his petition rises or falls on proving a connection between the treatment of his father-in-law and his own

-9-

circumstances if returned to Egypt.[1]  App. at 83.  Shoaira claims she suffered persecution by being forced to watch her father's mistreatment by Egyptian authorities.  She witnessed three of Abdulmann Shoaira's four arrests.  On the second occasion, she was only eight years old, and when she went to help her father, she was pushed to the ground by a police officer.  Her therapist testified that Shoaira exhibited symptoms of post-traumatic stress disorder to support Shoaira's claim that she suffered a direct injury from witnessing these events.  The statute leaves the term "persecution" undefined, but we have defined it as "the infliction or threat of death, torture, or injury to one's person or freedom" for a proscribed reason.  Regalado-Garcia v. INS, 305 F.3d 784, 787 (8th Cir. 2002).  While mental or emotional injury may in part constitute persecution, Duarte de Guinac v. INS, 179 F.3d 1156, 1163 (9th Cir. 1999), "'persecution is an extreme concept.'  Low-level intimidation and harassment does not rise to the level of persecution."  Eusebio v. Ashcroft, 361 F.3d 1088, 1090 (8th Cir. 2004) (internal citation omitted) (quoting Fisher v. INS, 79 F.3d 955, 961 (9th Cir. 1996) (en banc)).  We hold that the psychological damages Shoaira received from the rough treatment of the Egyptian authorities and from witnessing her father's arrest on three occasions does not rise to the level of persecution.

Both petitioners assert that their persecution is inevitable if returned to Egypt because of the treatment Shoaira's father received.  The IJ did not question that Abdulmann Shoaira had been persecuted on the basis of the political beliefs the Egyptian authorities falsely imputed to him.  The petitioners claim that the Egyptian authorities imputed to the father a desire to overthrow Egypt's secular government because he is a fundamentalist Muslim who dresses and grooms himself according to a strict traditional regime.  Shoaira and Tobar assert that the government will make the same connection in their cases because they also adhere to traditional dress and

---

[1]Even had Tobar not conceded this point, his detention on two separate occasions for periods of several hours does not alone rise to the level of persecution.  Tawm v. Ashcroft, 363 F.3d 740, 743 (8th Cir. 2004) (stating that two incidents of detention that occurred four years apart and lasted only a few hours "do not necessarily constitute persecution").

are related to Abdulmann Shoaira. According to the petitioners, the authorities even questioned Abdulmann Shoaira about Tobar's beliefs after he accompanied his daughter to the United States.

Unfortunately for the petitioners, this evidence does not compel us to overturn the IJ's determination that their fear, though quite possibly genuine, is not well-founded. The petitioners do present some evidence that the Egyptian government takes a special interest in people who adhere strictly to Muslim traditions. But generalized government interest in a group to which the petitioners belong does not suffice to show that the petitioners will be persecuted if returned to Egypt. To succeed in their claim of derivative persecution, the petitioners must show a "'pattern of persecution closely tied to the petitioner.'" Ramos-Vazquez v. INS, 57 F.3d 857, 861 (9th Cir. 1995) (quoting Arriaga-Barrientos v. INS, 937 F.2d 411, 414 (9th Cir. 1991)); see also Ciorba v. Ashcroft, 323 F.3d 539, 545 (7th Cir. 2003) (stating that to show derivative persecution, an applicant must "show that her family's political opinions have been imputed to her and that she has suffered or will suffer persecution as a result"). The petitioners suggest two potential explanations for Abdulmann Shoaira's treatment, and neither satisfies this test. First, the petitioners claim that Abdulmann Shoaira was picked out solely because he wears a beard and traditional Muslim clothing, which fails to distinguish them from any other traditional Muslim in the country. Second, the petitioners claim that he was persecuted because he previously had criticized the government. The petitioners do not claim that they have a history of dissent. This explanation of the authorities' past behavior, then, gives Shoaira and Tobar reason to think that they will not be mistreated. We hold that the evidence does not compel us to conclude that either petitioner has a well-founded fear of future persecution.

V.

For the reasons provided above, we deny the petition.

_____

-11-