PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MAME FATOU NIANG,

*Petitioner,*

v.

ALBERTO R. GONZALES,

*Respondent.*

No. 06-1470

On Petition for Review of an Order of the
Board of Immigration Appeals.
(A97-638-292)

Argued: March 14, 2007

Decided: June 12, 2007

Before NIEMEYER and WILLIAMS, Circuit Judges, and T. S.
ELLIS, III, Senior United States District Judge for the Eastern
District of Virginia, sitting by designation.

---

Affirmed by published opinion. Senior Judge Ellis wrote the majority
opinion, in which Judge Niemeyer joined. Judge Williams wrote an
opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Peter Nyoh, ENOW & PATCHA, Silver Spring, Mary-
land, for Petitioner. Kristin Kay Edison, UNITED STATES
DEPARTMENT OF JUSTICE, Office of Immigration Litigation,
Washington, D.C., for Respondent. **ON BRIEF:** Kell Enow, ENOW
& PATCHA, Silver Spring, Maryland, for Petitioner. Peter D. Keis-

ler, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent.

## OPINION

ELLIS, Senior District Judge:

This is an appeal from a final order of removal of the Board of Immigration Appeals ("BIA"), denying petitioner's application for withholding of removal because (i) she failed to establish a "clear probability" of persecution and (ii) she could not assert a claim based on a fear that her five-year old U.S. citizen daughter would be subjected to female genital mutilation ("FGM")[1] if petitioner were removed to Senegal and her daughter accompanied her. We affirm on the record presented.

### I.

Petitioner, Mame Fatou Niang ("Niang"), is a native and citizen of Senegal. In August 2000, she was admitted to the United States as a non-immigrant visitor authorized to remain in the U.S. until November 8, 2000.

---

[1]"FGM" refers to a group of "surgical procedures involving the removal of some or all of the external genitalia, performed primarily on girls and young women in Africa and Asia." *Haoua v. Gonzales*, 472 F.3d 227, fn. 5 (4th Cir. 2007). These barbaric surgical procedures constitute an extreme form of child abuse and are an insult to human dignity and an affront to any civilized people. As we have previously noted, FGM is "[o]ften performed under unsanitary conditions with highly rudimentary instruments" and results in the painful, permanent disfigurement of the female genitalia, and exposes victims to a myriad of serious and potentially life-threatening complications. *Id.* (listing as possible complications: bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus).

Soon after her arrival in the U.S., Niang became romantically involved with Papa Samba Ane ("Ane"), a Senegalese native who has nearly completed the process of adjusting his status in the U.S. On July 8, 2001, Niang gave birth to the couple's first child, a daughter named Fatime Ane ("Fatime"). Two years later, on February 11, 2003, Niang gave birth to the couple's second child, a son named Mohamed Ane ("Mohamed").

Several months after the birth of Mohamed, in August 2003, Niang filed an asylum application with the U.S. Department of Homeland Security ("DHS"), seeking relief from removal based on her religion and her membership in a particular social group. In an affidavit appended to her application, Niang stated that she is from northern Senegal and is a member of the Toucouleur ethnic group, a group that, as she put it, practices FGM at "an alarming[ly] high rate." J.A. 87.[2] Indeed, Niang stated she was subjected to FGM at a young age, causing her to suffer long-lasting health and psychological problems. Niang further stated that Fatime's paternal grandparents have been requesting, in "intimidating and threatening letters," that Niang take Fatime to Senegal to undergo FGM.[3] Moreover, Niang stated Ane is "indifferent" to his parents' request and "[t]his indifference . . . means [Ane] tacitly accept[s] their request." J.A. 88-89. As a result of Ane's indifference and his parents' request, Niang stated she feared that if she were removed to Senegal, her daughter would be forced to undergo FGM there. J.A. 87.

On October 28, 2003, DHS charged Niang with removability, pursuant to 8 U.S.C. § 1227(a)(1)(B), for remaining in the U.S. beyond the time permitted by her non-immigrant visa. In response to this charge, Niang, represented by counsel, appeared before an Immigration Judge ("IJ") and admitted the charges against her, conceded removability, but sought relief from removal in the form of asylum,

---

[2]Citations to the "J.A." refer to the joint appendix filed in this appeal.

[3]Fatime's maternal grandparents in Senegal do not appear to be a factor in the FGM equation, as Niang reports that they believe a daughter belongs to her father's family and that Niang "has no right to refuse to have the child circumcised." If she does refuse, Niang believes "it will be a shame on [Niang's family] and they will be a target for insults from other members of society." J.A. 89.

withholding of removal, protection under the Convention Against Torture ("CAT"), or, alternatively, voluntary departure.

At a December 7, 2004 hearing on her various requests for relief from removal, Niang testified that she is a citizen of Senegal and a member of both the Mandingo and Toucouleur tribes and that while in the U.S. she gave birth to Fatime and Mohamed, who, at the time of the hearing, were 3 years old and 22 months old, respectively. Initially, Niang testified that Ane lives with her, but later testified that Ane does not live with her, but that "he's around sometimes." J.A. 44, 54. She further testified that the Toucouleur tribe is "traditionalist" and continues to practice FGM and that although the Senegalese government has made FGM illegal, "people continue to practice excision in hiding" and she "saw many violations of that law." J.A. 42. She also testified that in 2002 she read a letter from Fatime's paternal grandfather asking that Fatime be sent to Senegal to undergo FGM and learned that Ane "agrees with his family." J.A. 45. Niang's asylum application was, in part, prompted by this letter.

In support of her application and testimony, Niang submitted (i) medical documents indicating that she had been subjected to FGM and that in December 2000, she suffered from fibroids; (ii) her Senegal passport and her children's birth certificates; (iii) the June 12, 2002 letter, purportedly from Ane's father; and (iv) a U.S. Department of State report concerning FGM in Senegal, released June 1, 2001. This report states, *inter alia*,

    (a)    that studies estimate between 5% and 20% of the female population has been subjected to FGM;

    (b)    that up to 88% of "females among the minority Halpularen (Peul and Toucouleur) in rural areas of eastern and southern Senegal practice FGM;" and

    (c)    that in January 1999, the Senegalese government made FGM illegal, but there have been no convictions as of the 2001 report.

J.A. 112-15.

The government also submitted documentary evidence, namely the 2003 Country Report on Human Rights Practices for Senegal, prepared by the U.S. Department of State and released on February 25, 2004. This report states, *inter alia*,

    (a)   that FGM is not practiced by the Wolof, the largest ethnic group, constituting 43% of the Senegalese population;

    (b)   that one of the most extreme forms of FGM is sometimes practiced by the Toucouleur, particularly in rural areas;

    (c)   that FGM is most prevalent in eastern Senegal;

    (d)   that FGM is a criminal offense, carrying a jail term of 6 months to 5 years for those practicing FGM or ordering that it be carried out. As of the 2003 report, trials in a 2002 and a 2001 case were still pending;

    (e)   that the government has established programs to educate women about the dangers of FGM and there are national and local government action plans against FGM; and

    (f)   that since 1997, 1,031 villages, including 13 in northern Senegal, have prohibited FGM, constituting over 20% of the villages that had previously practiced FGM.

J.A. 64-75.

Following this hearing, the IJ denied all of Niang's applications for relief and ordered her removed to Senegal. Specifically, the IJ found Niang's asylum application untimely, as it was filed more than three years after her arrival in the U.S. The IJ also found that circumstances did not warrant tolling. Despite this finding, the IJ went on to address the substance of Niang's asylum claim and found it meritless because Niang had not established that she would be persecuted on the basis of any protected ground if removed to Senegal, nor had she estab-

lished any valid derivative claim given that her daughter, a U.S. citizen, was entitled to remain in the U.S.[4] The IJ also denied Niang's claim for withholding of removal based on a fear of persecution for the same reasons, noting correctly that this result follows from the fact that the standard applicable to a withholding claim is more rigorous than the standard applicable to an asylum claim. *See Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). The IJ further concluded that Niang's CAT claim failed and that she was ineligible for voluntary departure.

Niang appealed the IJ's decision to the BIA, which affirmed the IJ's factual findings and specifically concurred with the IJ's conclusions that Niang's asylum application was untimely and that Niang had failed to demonstrate either past persecution or a clear probability of future persecution.

Niang now appeals only two aspects of the BIA's decision, thereby presenting two questions for review: (i) whether Niang can assert a claim for withholding of removal based on the psychological harm she will suffer if her daughter accompanies her to Senegal and is there subjected to FGM; and (ii) whether Niang can assert a "derivative" claim for withholding of removal based on the alleged persecution her

---

[4]The IJ noted that Niang was not eligible for a grant of humanitarian asylum because the fact that she was subjected to FGM thirty-three years ago was not sufficiently compelling under *In re Chen*, 20 I. & N. Dec. 16 (BIA 1989), which held that an IJ, in his discretion, may grant asylum in the absence of a well-founded fear of future persecution where an applicant suffered past atrocious forms of persecution. *See* 8 C.F.R. § 1208.13(b)(1)(iii)(A) (providing that an applicant who demonstrates "compelling reasons for being unwilling or unable to return to the country arising out of the severity of past persecution," may be granted discretionary asylum absent a well-founded fear of future persecution).

While Niang did not appeal this decision, it is worth noting that a humanitarian grant of asylum may be warranted in circumstances where a mother, who has been subjected to FGM, fears her daughter will be subjected to FGM if she accompanies her mother to the country of removal. *See Osigwe v. Ashcroft*, 77 F. Appx. 235, 235 (5th Cir. 2003)(remanding to BIA to adjudicate humanitarian asylum claim where applicants claimed their minor daughter, a U.S. citizen, would undergo FGM if they were removed and she accompanied them).

daughter will face if she accompanies Niang to Senegal and is there subjected to FGM[5]

## II.

At the outset, it is important to note that FGM — a barbaric practice unbecoming of a civilized society — is prohibited by law in this and many other countries, including Senegal.[6] Accordingly, we and our sister circuits have appropriately recognized that FGM constitutes "persecution" within the meaning of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and thus the threat of FGM may serve as a basis for asylum or withholding of removal claims. *See Barry v. Gonzales*, 445 F.3d 741, 745 (4th Cir. 2006). This settled principle is not at issue here. Instead, the essential question presented in this appeal is whether the record in this case *compels* reversal of

---

[5]Notably, because Niang does not appeal the BIA's decision with respect to her untimely asylum application, her CAT claim, or her claim for voluntary departure, she has waived these issues. *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (stating that issues not raised on appeal are waived).

It is worth noting that, even assuming Niang had not waived the timeliness issue with respect to her asylum claim, we lack jurisdiction to review the BIA's decision in this respect. 8 U.S.C. § 1158(a)(3); *see Blade v. Gonzales*, 2007 U.S. App. LEXIS 3563, at *1-2 (4th Cir. 2007) (finding no jurisdiction to review asylum claim denied as untimely); *Lin v. Gonzales*, 190 Fed. Appx. 301, 305 (4th Cir. 2006) (stating where an alien simply challenges "the timeliness of an alien's asylum application [this] is usually a question of fact . . . [which] courts of appeal will not have jurisdiction to review").

[6]*See* 18 U.S.C. § 116 (making the practice of FGM illegal); Senegal Law No. 99-05 of 29 January 1999 Amending Various Provisions of the Penal Code [Art. 2]; Report of the Committee on the Elimination of All Forms of Discrimination Against Women, General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38 & Corr. 1, at 80, P 438, U.N. Doc. A/45/38 (1990); Declaration on the Elimination of Violence Against Women, G.A. Res. 104, U.N. GAOR, 48th Sess., Art. 2(a), U.N. Doc. A/48/629 (1993); Traditional or Customary Practices Affecting the Health of Women and Girls, G.A. Res. 128, U.N. GAOR, 56th Sess., Supp. 49 at 2, U.N. Doc. A/RES/56/128 (2001).

the BIA's determination that Niang is not eligible for withholding of removal on the grounds she asserts.

The question is appropriately framed in this fashion because an alien asserting a claim for withholding of removal on persecution grounds must show "that it is more likely than not that her life or freedom would be threatened in the proposed country of removal because of her race, religion, nationality, membership in a particular social group, or political opinion." *Haoua*, 472 F.3d at 232.[7] More precisely, an applicant for withholding bears the burden of demonstrating a "clear probability" that she will face persecution in the country of removal. *Rusu v. INS*, 296 F.3d 316, 324 n.13 (4th Cir. 2002) (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)); see 8 C.F.R. § 1208.16. It follows from these principles that where, as here, the BIA has found that the petitioner has not met this burden, we will affirm the BIA's determination if it is supported by substantial evidence on the record considered as a whole. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Thus, the IJ's or the BIA's factual findings[8] are "conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been *compelled* to conclude to the contrary." *Haoua*, 472 F.3d at 231 (emphasis added). And significantly, where the "record [ ] plausibly could support two results: the one the IJ chose and the one [the petitioner] advances," reversal is only appropriate where the court "find[s] that the evidence not only supports [the opposite] conclusion, but *compels* it." *Balogun v. Ashcroft*, 374 F.3d 492 (7th Cir. 2004) (emphasis added) (citing *Elias-Zacarias*, 502 U.S. at 481 n.1).

In sum then, the specific questions presented, distilled to their essence, are whether the record compels reversal of the BIA's determinations (i) that Niang cannot assert a claim for withholding of

---

[7]In particular, 8 U.S.C. § 1231(b)(3)(A) provides that the "Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

[8]Because the BIA affirmed the IJ's order and supplemented it, the factual findings and reasoning contained in both decisions are subject to judicial review. *See Haoua*, 472 F.3d at 230.

removal based on the psychological harm she will suffer if her daughter accompanies her to Senegal and is there subjected to FGM; and (ii) that Niang cannot assert a "derivative" claim for withholding of removal based on the alleged persecution her daughter will face if she accompanies Niang to Senegal and is there subjected to FGM.

## A.

Niang's first claim for withholding of removal focuses on the psychological harm she claims she will suffer if her daughter accompanies her to Senegal and is there subjected to FGM. This claim fails as a matter of law because it is well-established that "[p]ersecution involves the infliction or threat of death, torture, or injury *to one's person or freedom*." *Li v. Gonzalez*, 405 F.3d 171, 177 (4th Cir. 2005) (emphasis added). This settled principle is firmly anchored in the statutory language stating that withholding of removal is warranted where "the alien's *life or freedom* would be threatened . . ." on the basis of a protected ground. 8 U.S.C. § 1231(b)(3)(A) (emphasis added). Thus, to establish a claim for withholding an applicant cannot rely solely on psychological harm or a threat of such harm to others, but must also establish injury or a threat of injury to the applicant's person or freedom.[9] *See Osigwe v. Ashcroft*, 77 F. Appx. 235 (5th Cir. 2003) (finding petitioners could not establish an asylum claim "based

---

[9]While the dissenting opinion argues that "[t]his holding stands in tension with the BIA's decision in *In re C-Y-Z*, 21 I. & N. Dec. 915 (BIA 1997) (en banc)," a review of that decision reveals no such tension. As the dissent points out, *C-Y-Z* held that a petitioner could apply for asylum on the basis of his spouse's forced sterilization. Importantly, the BIA reached this holding based on "the enactment of section 601(a) of the IIRIRA [defining refugee] and the agreement of the parties that forced sterilization of one spouse on account of a ground protected under the Act is an act of persecution against the other spouse." *Id.* at 919. Thus, the BIA's holding was not based on, nor did the BIA even discuss, any alleged psychological harm that would be suffered by the petitioner if his spouse was forced to be sterilized. It appears, then, that *C-Y-Z* stands for the proposition that the BIA permits a petitioner to support his petition by relying on harm to another person only in the limited context of forced sterilizations; it does not stand for the proposition that the BIA permits petitioners to rely on psychological harm, without physical harm, to establish eligibility for withholding of removal under the INA.

solely on their daughter's risk of being subject to FGM if she is returned to Nigeria").[10] The record reflects that Niang has not met this requirement.

Niang hopes to avoid this conclusion by relying on *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004). There, the Sixth Circuit, relying on BIA decisions suggesting a "governing principle" in favor of granting parents refugee status where their child faces physical torture, held that an alien mother was eligible for asylum, in her own right, based upon her fear that her minor daughter, also an asylum applicant, would be forced to undergo FGM if the daughter were removed. *Id.* at 642. Significantly, *Abay* is the only federal decision permitting a parent to seek relief, in her own right, based solely on the psychological suffering she will endure if her daughter will be subjected to FGM upon removal. We do not find *Abay* persuasive here, both because it is factually distinguishable and because psychological harm, without any accompanying physical harm, does not constitute "persecution." First, *Abay* is clearly distinguishable because, unlike the asylum applicant in *Abay*, Niang's daughter is a U.S. citizen; accordingly, there is no clear probability that Niang's daughter will be subjected to FGM as she could remain in the U.S., albeit without Niang, and avoid any potential persecution. Second, *Abay* is unpersuasive because its holding is an unwarranted expansion of the statutory definition of persecution. *See* 8 U.S.C. § 1231(b)(3)(A); *Li v. Gonzalez*, 405 F.3d at 177).

---

[10]*See also Mengistu v. INS*, No. 98-2003, 1999 U.S. App. LEXIS 5776, at *6 (4th Cir. March 29, 1999) (affirming BIA's determination where petitioner "[a]lthough she may have been verbally abused, she did not offer any evidence of a particular physical assault or other type of assault that could be characterized as an act which would rise to the level of persecution"); *Shoaira v. Ashcroft*, 377 F.3d 837, 844 (8th Cir. 2004) (holding that petitioner's psychological damages, resulting from the "rough treatment" of government authorities and witnessing her father's arrest, did not rise to the level of persecution, noting "[w]hile mental or emotional injury may in part constitute persecution, persecution is an extreme concept."); *but see Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004) ("Persecution may be emotional or psychological, as well as physical.").

In sum then, because "persecution" cannot be based on a fear of psychological harm alone, Niang's withholding claim fails as a matter of law because it focuses solely on the psychological harm she claims she will suffer if her daughter accompanies her to Senegal and is there subjected to FGM. Accordingly, we affirm the BIA's determination in this respect.

B.

Niang also asserts a "derivative" claim for withholding of removal based on the alleged persecution her daughter will face if she accompanies Niang to Senegal and is there subjected to FGM. While Niang concedes that the INA does not provide for a "derivative" withholding of removal claim,[11] she argues that we should nonetheless recognize a derivative claim in this case because of the barbaric nature of FGM. While we have not previously addressed whether such a claim may be asserted, other circuits have done so and declined to recognize this derivative claim. *Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003) (holding that "[A]n alien parent who has no legal standing to remain in the United States may not establish a derivative claim for asylum by pointing to potential hardship to the alien's United States citizen child in the event of the alien's deportation."); *Olowo v. Ashcroft*, 368 F.3d 692 (7th Cir. 2004) (same); *Axmed v. United States AG*, 145 Fed.

---

[11]The INA does recognize a derivative asylum claim, thereby granting asylum status to a spouse or child who accompanies an alien who is granted asylum status, even though the spouse or child is not otherwise eligible for asylum. *See* 8 U.S.C. § 1158(b)(3). As Niang conceded at oral argument, this provision is inapplicable here because, even assuming § 1158(b)(3) extends to withholding claims, the statutory language does not provide a derivative claim to parents of U.S. citizens. *See* 8 C.F.R. § 207.7(b) (listing parents as ineligible for derivative asylum). This omission may be intended to "prevent wholesale circumvention of the immigration laws by persons who enter the country illegally and promptly have children to avoid deportation." *Hernandez-Rivera v. INS*, 630 F.2d 1352, 1356 (9th Cir. 1980). While such omission may work a hardship on U.S. citizen children, who may be forced to accompany their parents to the country of removal, we and our sister circuits have held that this hardship is countenanced by the INA and not violative of the children's constitutional rights. *Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986).

Appx. 669, 675 (11th Cir. 2005) (upholding BIA's decision to deny motion to reopen asylum application, sought because petitioner feared that if she were removed her U.S. citizen daughter would join her and be subjected to FGM, agreeing with circuits declining to find a derivative claim where petitioner's daughter is a U.S. citizen because "asylum is only available to aliens who are personally at risk").

The INA compels this result because the statutory text is clear — to establish eligibility for withholding of removal the alien must demonstrate that "*the alien's* life or freedom would be threatened" in the country of removal. 8 U.S.C. § 1231(b)(3) (emphasis added). Thus, the statute permitting withholding of removal does not encompass derivative withholding claims, that is, claims for withholding of removal based on persecution to another person; instead, an alien seeking withholding of removal must establish that *they* will suffer harm if removed. The one exception to this general rule is provided by § 1229b, which provides that the Attorney General may cancel removal of an alien if the alien (i) has been physically present in the U.S. for ten years or more before seeking cancellation of removal; (ii) has been of good moral character during such period; (iii) has not been convicted of certain statutory offenses; and (iv) "establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States." Thus, the INA provides that hardship to U.S. citizen children may be a basis for cancellation of removal in certain specific circumstances not present here. Indeed, Niang's counsel conceded at oral argument that Niang is not entitled to relief under § 1229b, presumably because she cannot satisfy the ten year physical presence requirement.

As § 1229b does not apply here, Niang may be entitled to relief from removal only if she satisfies the standard set forth in § 1231, that is, by demonstrating that she will suffer persecution if removed to Senegal. *See* 8 U.S.C. § 1231(b)(3) (requiring that "*the alien's* life or freedom would be threatened" in the country of removal) (emphasis added). She has not done so on this record, choosing instead to rely on the alleged persecution her daughter will face if the daughter accompanies Niang to Senegal. Where, as here, an alien is not eligible for relief under § 1229b, there is simply no statutory or regulatory authority for her to claim withholding of removal based on threatened

hardship to her U.S. citizen minor daughter.[12] As Congress has not provided for such a derivative withholding claim, we will not judicially amend the statute to create one.

We are, of course, mindful that the result reached here presents Niang with a heart-wrenching dilemma: either allow Fatime to remain in the U.S. with her father but without her mother, or take Fatime to Senegal where Niang fears Fatime will be forced to undergo FGM. The tragic nature of this choice is undeniable, but it does not warrant that we recognize a derivative claim where Congress has not seen fit to provide for it.[13] *See Oforji*, 354 F.3d at 618 (recognizing the difficult choice faced by petitioner, but explaining that "Congress has foreseen such difficult choices, but has opted to leave the choice with the illegal immigrant, not the courts"). Accordingly, consistent with the other circuits that have considered this question, we conclude that Niang may not assert a derivative claim for withholding of removal based on the potential persecution of her U.S. citizen daughter if Niang is removed to Senegal and her daughter accompanies her.[14] *See*

---

[12]*Cf. In re S-L-L*, 24 I. & N. Dec. 1, 31 n.1 (Pauley, concurring) ("While FGM may be a pernicious form of persecution, it is difficult to understand why a fear that it may be performed on *another person*, albeit one's child, is a ground for asylum, any more than if a parent had a fear that a child would be singled out for persecution on account of political opinion, race, or religion") (emphasis in original).

[13]It is worth noting that, in some circumstances, it might be appropriate to remand to the BIA a claim presenting such a Sophie's choice to determine whether it warrants a grant of humanitarian asylum. *See Osigwe*, 77 F. Appx. at 235 (remanding to BIA to adjudicate humanitarian asylum claim where applicants claimed their minor daughter, a U.S. citizen, would undergo FGM if they were removed and she accompanied them). In this case, the IJ considered whether the circumstances warranted humanitarian asylum and decided that they did not. As the humanitarian asylum claim was decided, and as Niang has not appealed that decision, a remand is not appropriate here.

[14]Notably, even assuming Niang could assert a derivative claim, the record does not compel reversal as Niang did not establish a "clear probability" that Fatime would be subjected to FGM if Niang is removed. This is so because (i) Fatime is a U.S. citizen, entitled to remain in the U.S., despite her mother's removal; (ii) beyond Niang's testimony, there

*Oforji*, 354 F.3d 609; *Olowo*, 368 F.3d 692; *Axmed*, 145 Fed. Appx. 669.

For the foregoing reasons, we dismiss the petition for review and affirm the BIA's decision. We do so reluctantly because we recognize that removal places Niang on the horns of a terrible dilemma. While it is entirely reasonable to believe that the law ideally should not present mothers with such dilemmas, the existing law does. Thus, the state of the law and the contents of this record require that we affirm the BIA.

*AFFIRMED*

WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's analysis of Niang's derivative claim of withholding of removal based on harm to her daughter.[1] I disagree, however, with the majority's disposition of Niang's claim of withholding based on the psychological harm Niang claims she will suffer if she is removed to Senegal and forced to subject her daughter to female genital mutilation (FGM). For the reasons that follow, I

is no record evidence that Ane favors FGM; (iii) aside from the 2002 letter, purportedly from Ane's father, there is no evidence of "threatening or demanding letters" from Ane's family, as Niang testified she received; (iv) there is no clear record evidence that FGM is practiced by the Toucouleur in *northern* Senegal; and (v) State Department reports indicate FGM is growing less common and "hardly practiced at all in the most heavily populated urban areas;" thus, Niang might protect Fatime by residing in an urban area.

[1] I agree with the majority that we lack jurisdiction to review the BIA's denial of Niang's asylum application as untimely, *see* INA § 208(a)(3), 8 U.S.C.A. § 1158(a)(3) (West 2005), and that Niang has waived appeal of her Convention Against Torture (CAT) claim and her claim of voluntary departure, *see Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (noting that Federal Rule of Appellate Procedure 28(a)(9)(A) requires an appellant's opening brief to set forth the appellant's "contentions and the reasons for them" and that failure to comply with the Rule's dictates with respect to a particular claim triggers abandonment of that claim on appeal).

believe that the majority, by independently creating a *per se* rule that psychological harm alone cannot constitute persecution, without considering the Board of Immigration Appeals (BIA)'s interpretation of the term "persecution" and without remanding the case for the BIA to address the issue in the first instance, oversteps its bounds and fails to afford appropriate deference to the BIA. Accordingly, I respectfully dissent.

I.

A.

Although the majority opinion purports to apply the substantial evidence standard, it in fact conducts a de novo inquiry into the meaning of the term "persecution" in 8 C.F.R. § 208.16 (West 2007). From this de novo inquiry, the majority derives a broad and potentially far-reaching legal precedent — that "psychological harm, without any accompanying physical harm, does not constitute 'persecution'." *Ante* at 10. This holding stands in tension with the BIA's decision in *In re C-Y-Z*, 21 I. & N. Dec. 915 (BIA 1997) (en banc), which held that an applicant for asylum and withholding of removal could establish persecution by virtue of his wife's forced sterilization. Neither the statute nor its implementing regulations define "persecution," and the majority, by (1) ignoring the BIA's interpretation of the term "persecution" in *In re C-Y-Z* and (2) independently establishing such a broad precedent without remanding for the BIA to consider the question in the first instance, fails to afford appropriate deference to the agency.

Although we review de novo questions of law determined by the BIA, *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004), we must afford appropriate deference to the BIA's interpretation of the Immigration and Nationality Act (INA or "the Act") and any attendant regulations, *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000) (stating that *Chevron* deference should be afforded to an agency's interpretation of an ambiguous statute and *Auer* deference to an agency's interpretation of its own regulation). Because the BIA adopted, affirmed, and supplemented the Immigration Judge (IJ)'s decision, "we review the decision of the IJ as supple-

mented by the BIA." *Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005).[2]

Under *Chevron*, a court reviewing an agency's construction of the statute it administers must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 476 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Pursuant to *Auer*, an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted).

The majority does not suggest that the term "persecution," which both the INA and its implementing regulations leave undefined, is unambiguous. Nevertheless, the majority declines to afford deference to, or even address, the BIA's interpretation of the term. The BIA, however, has not interpreted "persecution" to require a physical assault. To the contrary, in *In re C-Y-Z*, the Board, sitting en banc, held that an applicant for asylum and withholding of removal could establish persecution by virtue of his wife's forced sterilization. The Board reversed the IJ's determination that the applicant was "in effect . . . seek[ing] to ride on his wife's coattails" and had not himself been persecuted. *Id.* at 916. Board Member Rosenberg wrote a separate concurring opinion noting that it is not unusual in asylum cases for an applicant to demonstrate a well-founded fear of persecution "although the harm experienced was not by him, but by a family member," and that "it . . . constitutes persecution for the asylum applicant

---

[2]The majority opinion correctly states that we review the BIA's administrative findings of fact under the substantial evidence rule. *See* 8 U.S.C.A. § 1252(b)(4)(B) (West 2005); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (stating that an appellate court must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (internal quotation marks omitted)).

to witness or experience the persecution of family members." *Id.* at 926 (Rosenberg, concurring).

Also, we have previously stated that torture may constitute persecution. *See Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (stating that "[p]ersecution involves the infliction or threat of death, torture, or injury to one's person or freedom" (internal quotation marks omitted)). The majority, however, does not consider legal and non-legal definitions of "torture," which indicate that torture may be purely mental. The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), defines "torture" as involving an "act by which severe pain or suffering, *whether physical or mental*, is intentionally inflicted on a person . . . ." CAT, Article 1 (emphasis added). Section 2340 of Title 18, which implements the CAT, provides that "'torture' means an act committed by a person acting under the color of law specifically intended to inflict severe *physical or mental* pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C.A. § 2340(1) (West 2000 & Supp. 2006) (emphasis added). Similarly, dictionary definitions of "torture" include anguish "of body or mind." *See, e.g.*, *Merriam-Webster's Collegiate Dictionary* 1320 (11th ed. 2004).

Prior to 1965, the INA authorized the Attorney General "to withhold the deportation of any alien within the United States to any country in which in his opinion the alien would be subject to *physical persecution . . . .*" Pub. L. No. 82-414, 66 Stat. 163, 214 (1952) (codified at INA § 243(h), 8 U.S.C.A. § 1253(h)) (emphasis added). In 1965, Congress amended INA § 243(h) "by striking out 'physical persecution' and inserting in lieu thereof 'persecution on account of race, religion, or political opinion.'" An Act to Amend the Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911, 913 (1965). Thus, it appears that when Congress has intended to restrict the availability of withholding of removal only to aliens who face persecution that is physical in nature, it has done so explicitly.

Accordingly, I believe that the majority has established an interpretation of "persecution" that the BIA might well consider too narrow. The majority's expansive holding is in tension with, and makes no attempt to distinguish, the most analogous BIA decision available, *In*

*re C-Y-Z.* This conflict has occurred because the majority, rather than reviewing an interpretation of "persecution" advanced by the IJ or BIA, has independently established a judicial interpretation of the term that is unnecessary for the resolution of this case.

Neither the IJ nor the BIA purported to base its decision on the interpretation of "persecution" established by the majority. Because the BIA did not address whether the psychological harm Niang alleged could constitute "persecution" within the meaning of 8 C.F.R. § 208.16, I believe that we are required to remand Niang's claim to the BIA for the agency to address the issue in the first instance. *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) ("A court of appeals is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. . . . Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (internal quotation marks omitted)); *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (holding that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained").

B.

The IJ premised his ineligibility determination on the finding that Niang "ha[d] not shown that anything would happen to her because of the action that may be performed against her daughter," and therefore "ha[d] not made a case for herself in regards to persecution." (J.A. at 25.) In concluding that Niang had not shown anything would happen to her, the IJ did not address the evidence in the record that Niang would be prevented from protecting her daughter from FGM, an experience that would cause Niang severe mental suffering that she claimed would compound the psychological harm she had already suffered from enduring FGM as a young girl. The IJ also did not address evidence demonstrating the child's relatives' readiness to employ "mystical and social means [of making Niang] regret" her resistence to subjecting her daughter to FGM. (J.A. at 106.)

Niang described the Toucouleur ethnic group, to which she belongs, as "very traditional or traditionalist." (J.A. at 41.) She

explained that, for a Toucouleur girl, FGM represents an essential ini-
tiation ceremony, and although the government has made the practice
illegal, "family . . . has more weight than the laws," and she saw many
violations during her time in Senegal. (J.A. at 42.) Niang testified
that, as a result, she will have no means of protecting her daughter in
Senegal, where she will have "no power" and "wouldn't have any
choice" in whether her daughter was subjected to FGM. (J.A. at 50.)

Niang also supplied a letter from her daughter's paternal grandpar-
ents urging the child's father, Papa Samba Ane, to bring the child to
Senegal for FGM. Niang testified that Ane "agrees with his family"
and wants his daughter to undergo FGM. (J.A. at 45.) Niang's parents
also believe that Niang "ha[s] no right to refuse to have the child cir-
cumcised," and that, if she refuses to subject her daughter to FGM,
"it will be a shame on them and they will be a target for insults from
other members of the society." (J.A. at 89.)[3]

---

[3]I am unpersuaded by the Government's contention that Niang has not
demonstrated a clear probability that her daughter's relatives would sub-
ject her to FGM if the child accompanied Niang to Senegal because the
Senegalese government has banned the practice, and, as a result of edu-
cation and outreach programs, FGM is becoming less prevalent in Sene-
gal. The Government concedes that "[t]he State Department Report of
record provided that . . . in general, female genital mutilation was a prob-
lem in Senegal." (Appellee's Br. at 22.) Moreover, a State Department
Report specifically addressing FGM in Senegal provides that "up to 88
percent of females among the minority Halpularen (Peul and Tou-
couleur) in rural areas of eastern and southern Senegal practice [FGM]."
(J.A. at 112.) This report states that, "[a]lthough the government has been
actively seeking to eradicate this practice, we are unaware of any protec-
tion in place that might help a woman who wishes to avoid it." (J.A. at
114.) Furthermore, in addition to reports addressing generalized country
conditions, Niang presented evidence specifically related to her particu-
lar case. Her testimony and corroborating documentation revealed that
her daughter's relatives have a strong desire to subject the child to FGM,
and that the father agrees with his parents that his daughter should
undergo FGM, but has thus far been indifferent to their demands. The
Government does not question the reliability of the evidence related to
Niang's family, and the IJ's decision does not address the likelihood that
the child would suffer FGM in Senegal.

Niang further claimed that this mental suffering would be compounded by the lasting effects of the FGM that was performed on Niang as a child. When Niang was seven years old, her parents took her to a family circumsiser for "excision," which the World Health Organization classifies as "Type II" FGM. This form of FGM involves "the excision (removal) of the clitoral hood with or without removal of all or part of the clitoris." (J.A. at 112.)[4] Niang's affidavit provided that, as a result of this abuse, she "developed health complications ranging from vaginal infections [to] difficulty [in] conceiv-[ing] to vaginal bleeding." (J.A. at 88.) A doctor in Gabon diagnosed Niang with primary sterility and informed her that she would be unable to have children. Nevertheless, Niang, "fought all [her] life to have children." (J.A. at 48.) She was fortunate to have the benefit of the excellent gynecological and obstetrical assistance available in the United States, and, in 2001, at age 37, she gave birth to her daughter. In 2003, when Niang was 39, her son was born. Niang had difficult pregnancies with both children. During her first pregnancy, she experienced fibroids and bleeding and had an exam that was monitored as an emergency because she had a condition known as placenta previa.[5]

---

[4]Both this court and the BIA have recognized that FGM constitutes persecution within the meaning of the INA and its implementing regulations. *See Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007) ("We have heretofore recognized that FGM constitutes persecution within the meaning of the Act . . . ." (internal quotation marks and alteration omitted)); *In re Kasinga*, 21 I. & N. Dec. 357, 365 (BIA 1996) (concluding that FGM constitutes persecution within the meaning of the Act). We have previously noted that the practice, which the majority aptly describes as "an extreme form of child abuse . . .[,] an insult to human dignity and an affront to any civilized people," *ante* at 2 n.1, is "[o]ften performed under unsanitary conditions with highly rudimentary instruments, . . . is extremely painful, permanently disfigures the female genitalia, and exposes the girl or woman to the risk of serious, potentially life-threatening complications," *Haoua*, 472 F.3d at 230 n.5 (internal quotation marks and alteration omitted).

[5]Placenta previa is a condition in which the placenta develops in the lower uterine segment, in the zone of dilation, so that it completely or partially covers the cervical os (opening). *See* Dorland's Illustrated Medical Dictionary 1442 (30th ed. 2003). Complete placenta previa creates a risk of blood loss, and may become life threatening. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 & n.3 (3d Cir. 2000).

Medical records submitted with her application also reveal that she required a Cesarean section to deliver her second child.[6]

Niang also asserted that her psychological development was "considerably hampered," (J.A. at 88), by the physical trauma that she experienced as a young girl. She stated that "[t]he pains that I went through and the blood that was shed on [the day she was mutilated] keeps on revisiting me up until today." (J.A. at 88.) While in Senegal, Niang "witnessed young girls and at times women die due to complication[s]" resulting from FGM. (J.A. at 90.) She opposed excision, and because of this resistence, became estranged from her parents, who "considered [her] as a rebel against established rules and customs of the Toucouleur society." (J.A. at 88.) The IJ recognized that Niang had been a victim of FGM and did not make an adverse credibility finding or otherwise indicate that he disbelieved Niang. And, as Niang asserts, no reasonable fact-finder could deny that a devoted mother who continues to experience health and psychological problems as a result of FGM would experience severe mental suffering if she were forced to allow her daughter to suffer the same type of persecution. The IJ's finding that Niang "ha[d] not shown that anything would happen to her because of the action that may be performed against her daughter," (J.A. at 25), is irreconcilable with the record, which reveals that Niang would experience considerable mental suffering if her relatives prevented her from sparing her daughter the same persecution she endured as a child. Thus, I believe the record compels the conclusion that Niang would suffer an actual and concrete psychological harm if she were prevented from protecting her daughter from FGM. Accordingly, the IJ's conclusion that she would be unaffected is not supported by substantial evidence.

Finally, I note that, after finding that nothing would happen to Niang as a result of her daughter's persecution, the IJ reached another conclusion. The IJ found that, "[a]dditionally, there's no showing that the daughter would have to go back to Senegal," because the father, Ane, "seemingly [wa]s getting ready to be able to adjust his status through his employment," and Niang could allow the children to remain with him. (J.A. at 25.) That the child would not have to return

---

[6]It is unclear from the record whether Niang's first child was also delivered by a Cesarean section.

to Senegal to live, however, does not resolve the issue of whether the child would be sent to Senegal to undergo FGM. The IJ noted that although Niang feared that Ane would acquiesce and see that his daughter suffered FGM, Ane had not previously made any effort to take the child to Senegal. It is unclear, however, whether the IJ viewed Ane's past indifference as sufficient to support a finding that there was no clear probability Ane would acquiesce to his parent's demands if Niang's opposition were no longer an impediment to sending the child to Senegal.[7]

Moreover, the IJ's conclusion that the child would not have to return to Senegal ignores Niang's definitive statement that she would take her children with her to Senegal, where she would be sent if removed. Niang seems to face a Catch-22 — either leave her daughter with a father who believes the child should undergo FGM, or take her daughter with her to Senegal, where she will be powerless to prevent her daughter's relatives from subjecting her to FGM.

Because the IJ assumed that Niang would be unaffected by her daughter's persecution, the IJ did not consider whether the harm Niang would suffer constituted persecution within the meaning of the INA and its implementing regulations. And, as a result, the IJ did not fully consider whether the harm Niang would suffer was more likely than not to occur. Because the IJ's findings contradict the record and do not take into account all of the evidence submitted by Niang, and because neither the IJ nor the BIA fully considered whether the type of harm Niang alleges can constitute persecution, the best course of action would be to remand to allow the BIA to address these issues.

---

[7]It is worth noting that, under the regulations governing adjustment of status applications,

> the departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of any pending application for adjustment of status, unless the applicant was previously granted advance parole by the Service . . ., and was inspected upon returning to the United States.

8 C.F.R. § 245.2(a)(4)(ii)(A) (West 2007). Thus, Ane could not freely depart to Senegal while his adjustment of status application was pending.

## II.

In sum, I believe that the majority, by independently establishing a *per se* rule that psychological harm alone cannot constitute persecution, without considering the BIA's decision in *In re C-Y-Z* and without remanding the case for the BIA to address the issue in the first instance, oversteps its bounds and fails to afford appropriate deference to the agency. Accordingly, I respectfully dissent.